# Columbia Glass Company *v.* Atlantic Glass Company, Appellant.

*Practice, C. P.—Trial—Charge—Mistake—Review—Appeals—Assignments of error.*

1. The appellate court will not reverse a judgment on account of alleged misstatements in several portions of the charge quoted in various assignments of error, where an inspection of the portions of the charge complained of show no substantial misstatement of fact, and there is nothing in the record to indicate that the attention of the trial judge had been called to any misstatements at the trial.

*Evidence—Custom of trade—Opinion of witness—Construction of writing.*

2. While a witness may be examined as to the existence of a trade custom with reference to which a written contract may have been made, although the contract is silent as to the custom, the witness cannot be permitted to construe and interpret the written contract according to his idea of what the trade would understand from his language.    Such construction of a written agreement is primarily the function of the trial court, or, in certain cases, of the jury under the evidence with the aid of proper instruction from the court.

*Practice, C. P.—Verdict—Blank verdict—Reforming verdict.*

3. Where a jury seals a verdict and separates for the night, and when it is opened in the following morning in court is found to be "in favor of the plaintiff for ———— dollars," the court may direct the jury to return to their room to fix the amount of the damages if they find for the plaintiff.    A verdict in due form for a fixed sum subsequently brought in and properly recorded, is valid.

4. The trial judge has full power to see that the verdict, as finally rendered, shall be in the form sanctioned by long custom, and, with the consent of the jury, he may so mold and shape it as to make it conform to these requirements.

Argued March 1, 1910.   Appeal, No. 4, Feb. T., 1910, by defendant, from judgment of C. P. Lycoming Co., Sept. T., 1907, No. 106, on verdict for plaintiff in case of Columbia Glass Company v. Atlantic Glass Company. Before Rice, P. J., Henderson, Orlady, Head, Beaver and Porter, JJ.   Affirmed.

Assumpsit on a contract of sale.   Before Hart, P. J.

The opinion of the Superior Court states the case.

Verdict and judgment for plaintiff for $1,442.46.   Defendant appealed.

*Errors assigned* were (1–6) portions of the charge referred to in the opinion of the Superior Court; (7–10) rulings on evidence, sufficiently indicated in the opinion of the Superior Court; (11) in permitting the jury, after it had found and sealed a general verdict in favor of the plaintiff without mentioning any amount and separated, to reassemble and find a verdict for the plaintiff in a specific amount; and (12) receiving the verdict of the jury and in directing judgment to be entered thereon.

*Max L. Mitchell*, with him *A. M. Hoagland*, for appellant, cited, as to the custom: Wigglesworth v. Dallison, 1 Smith's Leading Cases, *594; Hutton v. Warren, 1 M. & W. 466.

Cited as to the verdict: McConnell v. Linton, 4 Watts, 357; Mishler v. Com., 62 Pa. 55; Kramer v. Kister, 187 Pa. 227.

*James B. Krause*, for appellee, cited as to the custom: Stoddard v. Emery, 128 Pa. 436; Hartje v. Collins, 46 Pa. 268; Dickinson v. A. O. U. W., 159 Pa. 258.

Opinion by Head, J., July 20, 1910:

The learned counsel for appellant asks us to consider collectively the first five assignments of error, each of which complains of a portion of the general charge.   He

opens his printed brief in the following language: "We do not contend that the portions of the charge assigned for error are misstatements of the law, but we insist that they are inaccurate statements of facts so serious, when taken collectively, as to make it the duty of this court to declare that the charge was misleading."

The plaintiff in this action sued to recover damages for the breach of a written contract by the terms of which it agreed to sell and the defendant agreed to buy 5,000 boxes of glass. The agreement was dated on January 25, 1907. The defendant was to have the privilege, within certain prescribed limitations, of specifying the sizes of the glass to be shipped and of having such shipments made by the plaintiff directly from the factory to the customers of the defendant. It follows, of course, that the plaintiff could ship only as specifications and shipping directions were received from the defendant. Under the terms of the contract the entire amount of glass covered by it was to be thus specified not later than April 1, 1907. The quality of the glass and prompt shipments were guaranteed by the plaintiff. In point of fact something less than 1,500 boxes were actually specified when the defendant refused and declined to make further specifications. The plaintiff, alleging that the market price of the glass afterwards fell and that it was compelled to market that portion of the order not taken by the defendant at less than the contract price, sought to recover the loss thus sustained.

By way of defense the defendant attempted to establish chiefly two propositions: 1. That the plaintiff had broken its covenant to make prompt shipments, and that its failure in this respect was so persistent and so detrimental to the business of the defendant as to warrant it in canceling the contract. 2. That the market price of glass, of the kind produced by the plaintiff and delivered by it, had not fallen in price, and as a consequence the plaintiff had suffered no actual damages, even if the contract had been unwarrantably broken. Much testimony, conflict-

ing in character, was offered by the parties, on the one hand to support these contentions of the defendant, on the other hand to rebut them.

As we read the charge of the learned trial judge, we can discover no such substantial misstatements of fact as to justify the conclusion that the minds of the jury were misled from the true line of inquiry invited by the issues of fact raised. And we would be especially reluctant to convict the learned trial court of error in this respect when, in no single instance, was any alleged misstatement of fact called to the attention of the judge by counsel. It is not contended, as we have seen, that the instruction to the jury on the question of the legal obligation of the plaintiff to fulfill the contract on its part, as a condition precedent to its right to recover, was in any way erroneous. The jury were fairly told that if the plaintiff had failed to make reasonably prompt shipments, as the contract provided, the defendant was justified in rescinding and the plaintiff could not recover. They were further told that if they found as a fact that there had been no drop in the market price of glass, that the plaintiff would have suffered no substantial injury. We can find no warrant in the charge for the criticism that the jury were practically instructed that if they found for the plaintiff at all they must find for the full amount of its claim. The evidence as to the amount of the loss offered by the plaintiff was clear and specific. There was no dispute as to the number of boxes of glass affected by the defendant's breach. If, therefore, the jury accepted the plaintiff's testimony as to the extent of the drop in price, but little remained for them, under the evidence, except to find as they did, the result in dollars and cents being a mere matter of computation.

In a word, the answer to these assignments must be found in the charge itself, and as we read it, it fails to disclose any reversible error. The first, second, third, fourth, fifth and sixth assignments are accordingly overruled.

The seventh, eighth, ninth and tenth assignments may

be considered together, as all of them complain of the rejection of different offers of testimony, made along the same line, for the alleged purpose of showing a custom in the glass trade which would read into this contract something it does not in terms contain.

It appears that in the window glass trade two general classes of window glass are recognized, viz., hand-made glass and machine-made glass. Some of the factories produced one kind, some the other. In no case, as we understand it, did any single factory produce both kinds. In so far as the sales of window glass by the factories were concerned, the business seems to have been to a large extent artificially controlled. Most of the factories producing machine-made glass were organized into an association called the American Window Glass Company. This association fixed the prices of the various sizes of glass and sold the product of all the factories which were members of it. In like manner most of the factories producing hand-made glass were bound together in an association known as the National Brokerage Association, which performed like functions for its members. These associations from time to time made and published, for the information of the trade, a price list, and it was their aim to so regulate and control the production and sale of glass as to hold the prices up to these published lists. It further appears that although there was some difference in the methods of manufacturing the two kinds of glass, and that, in the opinion of some of the witnesses, hand-made glass was intrinsically more valuable than machine-made glass, yet that the prices of the two were usually kept practically uniform.

Now the contract made by the parties provided simply for the sale and purchase of 5,000 boxes of window glass without any specification whatever as to whether it should be hand-made or machine-made. In point of fact, the plaintiff company manufactured only hand-made glass. There is no evidence that it delivered, in the performance of its contract, any other kind of glass, nor does the record

disclose a single instance in which any complaint was made by the defendant of the quality of the glass delivered.

It was not denied that about the latter part of March, 1907, the American Window Glass Company announced a substantial cut in the prices of glass. One of the main grounds of defense set up by the defendant was that this reduction did not affect the market for hand-made glass, the National Brokerage Association having refused to make a similar reduction. The defendant then contended that the subject-matter of its contract was hand-made glass only, and undertook to follow this by proof that there was no change in the market price of such glass. To maintain its contention that the subject-matter of its contract was hand-made glass alone the defendant made the several offers covered by the specifications we are now considering.

As we have already seen, the quality of the glass delivered was not a matter of dispute between the parties. Whilst the plaintiff insisted that it would have had the right, under its contract, if it became necessary in order to fill specifications for certain sizes, to have bought machine-made glass and shipped it, yet this was not done. The evidence offered was but to lay the foundation for the introduction of the more material testimony that there had been no change in the market price for hand-made glass for a considerable period after the cancellation of the contract. Now the court admitted all of the evidence on this point that was offered. The defendant was permitted to prove by several witnesses that the association which controlled, to the extent we have indicated, the price of hand-made glass, refused to make any cut in the prices and endeavored to hold them at what they had been at the time the contract was entered into. The plaintiff answered that whilst this might have been true, the business was actually unsettled by the cut that had been made by the American Window Glass Company, and that in point of fact, notwithstanding the efforts made to hold up the price of hand-made glass, both the association itself,

as well as others, were compelled to accept and did accept less than the published prices. It is not therefore entirely apparent that, even if there was technical error in the rejection of the offers complained of, any harm was thereby done to the defendant.

But as we view them, these offers were not to prove the existence in fact of a custom in the glass trade so ancient, so universal and so reasonable that all persons engaged in that business must be presumed to have had knowledge of such custom and to have contracted with reference to it although their contracts were silent on the subject.

The offer covered by the seventh assignment, which is typical of the remaining ones, was as follows: "Q. When a contract such as this contract of January 25, 1907, is entered into between a jobber and a glass manufacturing plant, does or does not the trade understand that the contract can only be filled by hand-made glass, or can it be filled by machine-made glass?" This was not an offer to prove as a fact that jobbers in contracting with factories never specified whether the glass they contracted for was to be hand-made or machine-made, but that under universal custom this was to be determined by the character of the factory which was selling. On the contrary, it was but an offer to permit the witness to construe and interpret this written contract according to his idea of what the trade would understand from its language. Now neither the witness nor the trade had the right to interpret or construe a written agreement. That was primarily the function of the trial court, or, in certain cases, of the jury under the evidence with the aid of proper instruction from the court.

The learned trial court gave the defendant full latitude to prove all the surrounding conditions and circumstances existing at the time the contract was made, the situation of the parties, their conversation, etc., as well as the manner in which the contract had been performed down to the time of the breach. We are unable to discover any re-

versible error in the rejection by the court of the offer we have quoted and the similar ones which are the subjects of the eighth, ninth and tenth assignments. These are therefore overruled.

The case was submitted to the jury late in the afternoon with the instruction that if they reached a conclusion after the court had adjourned they should seal up their verdict and bring it into court in the morning. On the following morning the jury came into court with a sealed verdict, they having, in accordance with the general custom, separated the previous evening after reaching a conclusion. The verdict as brought in was in the following form: "December 16, 1908, We find in favor of the plaintiff for ——— dollars." The learned trial court declined to receive the verdict in this form and instructed the jury to return to their room and if they found for the plaintiff to fix the amount of the damages. The jury retired and afterwards brought in a verdict in due form for a fixed sum. This was received in open court and properly recorded and judgment was afterwards entered upon it.

The learned counsel for the appellant complains that this action of the court was erroneous, and that after the jury had separated it could not be permitted to reassemble and fix the amount of the damages. With this we cannot agree. There was no verdict until one had been received in open court which the trial judge accepted and directed to be recorded. It has long been held that the trial judge has full power to see that the verdict, as finally rendered, should be in the form sanctioned by long custom, and, with the consent of the jury, may so mold and shape it as to make it conform to these requirements. In Reitenbaugh v. Ludwick, 31 Pa. 131, the report of the case shows "the jury returned into court with a sealed verdict, having separated before presenting it; after an examination the judge said it was not in form and recommitted it to them. To this the defendant excepted." In dismissing the assignment of error founded on that ex-

ception the Supreme Court, by THOMPSON, J., said: "The cases cited of McConnell v. Linton, 4 Watts, 357; Wolfran v. Eyster, 7 Watts, 38; Walters v. Junkins, 16 S. & R. 414, were abundant authority for the course pursued, in regard to a correction of the verdict. The jury having sealed it up, and separated on coming into court, it was found not to be in form to meet the whole case, and before receiving and recording it, the court sent them back to put it in due form. This is fully sustained by the cases, and, it is believed, is the universal practice throughout the state. The sealed paper was in fact not the verdict, until it was recorded, and until that was done, it was within the discretion of the court to send the jury back to consider and correct mistakes, or put it in form. . . . This discretion is an incident to the mode and manner of the trial and must be left to the courts, and, unless in a flagrant exercise of it, is not reviewable. It is in fact a condition implied of permitting the jury to seal up their verdict, that it may be subject to this mode of correction; otherwise, it is probable the practice never would have been allowed to prevail." In Smith v. Meldren, 107 Pa. 348, the action being replevin, the jury rendered a sealed verdict "for the plaintiff to the amount of replevin with interest," and then separated. On bringing the verdict into court on the day following the separation, the court instructed them to find the exact amount. This was assigned for error, but the assignment was dismissed with this brief statement by Chief Justice MERCUR. "It was within the power of the court to put the verdict in proper form. This is what it did." The eleventh assignment is therefore overruled.

After a careful examination of the entire record we are all of the opinion that it discloses no reversible error.

Judgment affirmed.