## SMITH et al. v. KEYSTONE WOOD PRODUCTS CO.

District Court, W. D. Pennsylvania.
November 9, 1927.

W. P. Gifford, of Erie, Pa., Edwards, O'Loughlin & George, of New York City, and Gunnison, Fish, Gifford & Chapin, of Erie, Pa., for plaintiffs.

John B. Brooks, of Erie, Pa., John E. Mullin, of Kane, Pa., and Allen J. Hastings and Frederick W. Kruse, both of Olean, N. Y., for defendant.

SCHOONMAKER, J. On trial by jury, the plaintiffs recovered a verdict for $87,003, damages for breach of a contract between the parties plaintiff and defendant for the installation by the plaintiffs, at the wood-acid plant of defendant, of a certain process for the extraction of acetic acid from pyroligneous acid. The defendant thereupon filed a motion for a new trial, assigning thirty-six errors on the part of the court in support of its motion. These were not all pressed by counsel for the defendant in their argument and briefs on this motion, and we shall only consider those assignments of error which were pressed on the argument.

A brief history of the case follows. The defendant is owner of a plant commonly called a wood alcohol plant, where wood is carbonized in retorts and distilled without the presence of air, thus converting the wood into charcoal and the volatile contents into gases and vapors which are put through condensers and converted into what is known as crude pyroligneous acid. From this acid there are recovered a number of products, among which are the commercially valuable wood alcohol and acetic acid.

The process involved in the contract in suit is one invented by Brewster, a chemical engineer, for the extraction of the acetic acid from the crude pyroligneous acid. The former method of treatment for this extraction was to boil the pyroligneous liquor, removing a certain quantity of tarry matters and then treating the boiled liquor with slack lime. That, with the acetic acid, formed acetate of lime, which was then treated with an equal amount of strong sulphuric acid, decomposing into a sulphate and acetic acid. This was a roundabout process and wasteful, because the alkali, lime, and sulphuric acid were wasted. Brewster came upon the scene in 1921 and devised a process of mixing ether—which has an affinity for acetic acid—with the pyroligneous liquor; the result being that the acetic acid permeates into the ether, which will then rise and leave the acid. For the purpose of applying the ether to the

pyroligneous liquor, Brewster devised a counter current apparatus, with a standpipe into which the acetic acid flowed at or near the top, and ether at or near the bottom; the ether and liquor passing in counter current, the liquor fell, due to its heavy gravity, and the ether rose, due to its lighter gravity, thus thoroughly mixing the two. The result of this was that the ether would take out a large proportion of the acid, and then, being mixed with acetic acid, would flow out of the top of the column, be distilled from the acetic acid, and conveyed back for reuse in the standpipe. The acetic acid thus recovered was a 60 per cent. solution, or approximately the same strength as the acid recovered by the prior methods.

Brewster conveyed his process to the plaintiffs, who built at Jersey City, N. J., a pilot plant to test the efficiency of this new method of extraction, and to demonstrate its commercial feasibility. The officers of the defendant company, which operates a number of wood alcohol plants in Northern Pennsylvania, visited this pilot plant and witnessed a six-day test of the plant, using liquor sent from defendant's plant at Smethport, Pa. The results of this test were satisfactory and the contract sued upon was then entered into on May 18, 1922. This contract recites the fact of the experimentation carried on with reference to this Brewster process; and the defendant thereby acknowledges its commercial practicability in the following language:

"(2) The company agrees and admits that it has seen the process mentioned in the recitals hereof in operation extending over a period of six days, during which an average of about 700 pounds of low grade pyroligneous acid, furnished by the company for that purpose, was first converted into 'boiled liquor' and then tested and treated, and that all steps in the process from the beginning to the end were open for inspection and were inspected by the accredited representatives of the company, and that the company is fully advised and has full knowledge and information with reference to the process and is satisfied as to its practicability from a commercial standpoint to such an extent that it is desirous of having the same installed in its plant at Betula, Pennsylvania, under the conditions herein provided."

The contract then provided that the defendant was to furnish the necessary buildings to house the plant and process at its own expense; and the plaintiffs were to install in these buildings the process and the necessary apparatus for the operation thereof, capable of handling 260,000 pounds of boiled liquor a day, and producing therefrom an aqueous solution containing not less than 50 per cent. of volatile acids; this product to be subsequently treated in such a way as to produce therefrom commercial acetic acid of varying percentages, not less, however, than what is known as 28 per cent. of acid, anything less than that to be returned for reextraction and further treatment.

For the use of this process and the necessary apparatus for its operation, the defendant agreed to pay the plaintiffs, upon the completion of the installation, and proof by a six-day test of the plant in actual operation that it would efficiently extract the quantity of acid specified in the contract, the following sums: (1) Actual cost of installing the necessary apparatus; (2) the cost of engineering, which was defined by the contract to be its actual cost plus 30 per cent.; (3) insurance premiums paid by plaintiffs for fire, casualty, and workmen's compensation; (4) an amount equal to 50 per cent. of the total cost, including all the above items, as profit; (5) a further sum of $500 per ton of acid daily capacity, which amount is arbitrarily fixed by the contract at $4,200; (6) a royalty of one-twentieth of one cent per pound of all acid sold by defendant resulting from the use of this process.

The compliance on the part of the plaintiffs with the terms of the contract for the installation of this process was to be determined by a six-day test run of the plant, to be made within sixty days after the plaintiffs should determine that the plant was in full working order. The plaintiffs proceeded with the execution of the contract, and offered evidence tending to prove that they had performed their part of the contract to the point of determining that the plant was in full working order on September 19, 1924, when they started with the defendant to conduct a test run, which they contended demonstrated the feasibility of the plant; but that thereafter, and before the expiration of the sixty-day period which they had under the terms of the contract in which to demonstrate the feasibility of the plant, they were excluded from the premises by the defendant and thereby prevented from putting the plant in condition to meet the terms of the contract.

The defendant, on the other hand, offered evidence to the effect that the plant was completed as originally planned by Brewster, on or before February 5, 1923, when the plaintiffs, as a matter of fact, determined that the plant was in full working order, and when the plaintiffs, in conjunction with the defend-

ant, proceeded with the six-day test provided for in the contract; that the result of this test was not satisfactory, and the plaintiffs then proceeded with alterations and changes to make the plant a success. These changes extended beyond the sixty-day period limitation provided for in the contract until on or about the 12th day of April, 1924, when the defendant, through its secretary, F. M. Quinn, verbally notified the plaintiffs, through their representative on the ground, Mr. Gibbons, that there could be but one more test, that the plaintiffs had experimented long enough to make the plant a success, and that the test which took place on the 19th of September, 1924, was a test which afforded the plaintiffs a final chance of demonstrating the efficiency of the plant. The results of this test were not satisfactory, whereupon the defendant declared the contract at an end. This was the principal issue in the case. The court left to the jury that issue of fact to decide, and defined the measure of damages.

Upon the result of this verdict for the plaintiff, this motion for a new trial has been filed. Thirty-six reasons for a new trial resolve themselves about the rulings upon evidence, the charges of the court submitting the case to the jury, and the measure of damages. The first fifteen reasons, relating largely to rulings on evidence, were not seriously pressed by the defendant in its motion for a new trial; and on a careful review of the testimony in the case we are unable to see that we erred in our rulings upon the objection to the testimony. These reasons are therefore not sustained.

█ The balance of the reasons filed by defendant relate largely to the charge of the court, the measure of damages given to the jury, and the computation of the amount after the jury had agreed upon a verdict for the plaintiffs, sealed their verdict and separated for the night. We have carefully reviewed our charge in this case, and conclude that we made no error in submitting the case to the jury for its determination, nor in the manner of its submission. There was an issue of fact in the case as to whether or not the plaintiffs had fulfilled the contract up to the time they were excluded from the premises by the defendant. This issue we think was clearly for the jury, who found that issue in favor of the plaintiffs and returned a verdict for the plaintiffs.

█ Now, as to the measure of damages, we think we correctly stated the rule to the jury. This case falls within the principle announced by the United States Supreme Court

in the case of United States v. Behan, 110 U. S. 338, 4 S. Ct. 81, 28 L. Ed. 168, holding that, where the breach of a contract consists in preventing its performance of the contract without the fault of the other party who is willing to perform it, the loss of the latter will consist of what he has already expended towards performance, less the value of the materials on hand, and the profits he would realize by performing the whole contract, if not remote and speculative. That was the rule we applied in this case. There was no evidence of any materials on hand that had not been worked up into the plant, so that there was no question of the value of materials on hand to be considered by the jury. The amounts that the plaintiffs expended upon the plant up to the time of their exclusion was not seriously disputed. The profits involved were neither remote nor speculative, in view of the provision of the contract fixing the profits at 50 per cent. of the total cost of installation; and, in addition to that, $500 per ton acid daily capacity of the plant, which was figured in the contract itself as $4,200. We therefore left the question of the loss of profit to the jury, who made no allowance for the 50 per cent. profit on the cost of installation, but did add the $500 daily capacity item, $4,200, and did allow a 50 per cent. profit on engineering fees amounting to $2,509.04. These items were duly provided for in the contract, and we think made up proper items of damage for the breach of the contract to be considered by the jury. There was a proper and adequate measure of damages given to the jury, and the verdict rendered comes clearly within that measure.

█ As to the assignments of error relating to the computation of the amount of this verdict, the jury in this case agreed to find a verdict in favor of the plaintiffs, but made no computation of the amount, sealed their verdict with that finding, and then separated for the night. The court refused to receive the sealed verdict when the jury came into court the next morning, and sent them out again to make a computation, which the defendants complain of as error. We do not so regard it; we believe that the power of the court to mold the computation of the amount by a jury after it has made its findings is well-established practice. The courts of Pennsylvania have continuously held that, after a jury has separated, the court may refuse to receive a sealed verdict and send them out again to fix the amount of damages. Columbia Glass Co. v. Atlantic Glass Co., 43 Pa. Super. Ct. 367; Smith v. Meldren, 107

Pa. 348; King v. McKinstry, 32 Pa. Super. Ct. 34; Commonwealth v. Fox, 46 Pa. Super. Ct. 172; Reitenbaugh v. Ludwick, 31 Pa. 131. The Supreme Court of the United States has held that it was not error to permit a jury to fill up, in open court, the amount of a verdict which they had signed and sealed, leaving the amount blank. Clark v. Sidway, 142 U. S. 682, 12 S. Ct. 327, 35 L. Ed. 1157.

█ Complaint was also made that we sent out a computation to the jury made up from the evidence of the plaintiffs as to the amount of the cost of installation. We do not believe there is any error in that. These computations are frequently sent out to a jury. In this case especially no harm could be done the defendant, for there was no serious dispute as to the items making up the cost of the installation of the plant.

█ The defendant has also assigned error to the refusal of the court to withdraw a juror and continue the case on account of the alleged improper remarks of counsel for the plaintiffs in the course of his argument, through an alleged misstatement of counsel for the plaintiffs that the defendant contended and objected because the plaintiffs have not asked enough damage. That possibly was not a correct statement of the legal status on the matter, but it was not sufficiently prejudicial to the rights of the defendant as to make it necessary to withdraw a juror and continue the case. The actual position of counsel for the defendant upon this point was at the very time stated in the presence of the jury, and we cannot see that there was anything so prejudicial to the rights of the defendant as to make it necessary to withdraw a juror and continue the case.

On the whole record, we are of the opinion that the case was fairly presented to the consideration of the jury, and with proper instructions. We find no reason to grant a new trial, and a motion for a new trial will therefore be refused.