Mary I. Stewart, Respondent, v. George B. Peck Company, a Corporation, Appellant.—135 S. W. (2d) 405.

Kansas City Court of Appeals.   July 3, 1939.

*Parker & Knipmeyer* for appellant.

*James W. Broaddus* and *Jos. R. Stewart* for respondent.

BLAND, J.—This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $4000, and defendant has appealed.

The facts show that defendant operates a retail dry goods store in Kansas City; that about 3:00 P. M. of September 14, 1936, plaintiff, a married lady, 66 years of age, visited defendant's store in company with her daughter for the purpose of shopping; that while her daughter was engaged in shopping on the first floor of defendant's store, plaintiff started from that floor to the basement by means of a stairway. From the first floor the stairway led eastwardly down to a landing, at which point it turned to the south. There were four steps between the landing and the basement floor. Plaintiff fell and was injured at the second step from the bottom.

The steps of the stairway were of steel pan construction. The tread or surface consisted of a Mason tread which was attached to the steel pan. The space between the tread and the pan was filled with concrete. Machine screws were screwed into nuts set in the concrete, thereby fastening the tread to the construction beneath. The heads of the screws were about a quarter of an inch in diameter. The steps were 5 feet 8½ inches long, 10½ inches wide and 7½ to 8 inches high. At the front edge and on the top of each step and running its full length was a metal tread 6 or 6½ inches in width and to the rear of this tread there was a strip of linoleum covering the remainder of the top of the step. The top of the metal part of the tread, referred to in some parts of the record as a plate, was constructed with alternate ridges and grooves. These grooves were $3/16$ to ¼ of an inch in depth. The metal tread or plate of each step was fastened with 14 to 16 machine screws. The screws were inserted in the step through holes located in the grooves. The steps had been constructed in the summer of 1935.

Plaintiff walked down the first flight of steps to the landing, proceeding along the right side of the stairway. When she reached the landing she walked over to the left side and started south down the remaining four steps to the basement, walking along the east or left

side of the stairway with her left hand on the railing and her pocketbook and gloves in her right hand. She was walking a foot or a foot and ahalf west of the railing. When plaintiff put her right foot on the last step and started to raise her left foot from the second step from the bottom something on the second step caught her left heel of her shoe holding her heel and causing her to fall forward on to the basement floor, twisting her as she fell and breaking her left hip. Her heel did not catch on the edge of the step.

Plaintiff's shoe was about 9½ inches in length. It was about 5½ inches from the center of the ball to the front edge of the heel of the shoe. The shoe had a military heel. Plaintiff testified that she might have had the point of her toe over the edge of the step when her heel caught; "the ball of my foot was on the step;" that her heel was 4 to 5 inches from the outer edge of the step. "I would say 6 inches." At one place she said it was 6½ inches.

After her fall the shoe which plaintiff was wearing at the time had a mark on the inside of the cap of the heel which mark did not go clear across but past the center. It was deeper on the right side.

Plaintiff's son, who examined the steps shortly after her fall testified that he examined the second step from the bottom and found that the metal plate thereon was loose and that it rattled; that he tested it by tapping his foot on it; that he examined the screws in the plate and found a loose screw located 15 to 16 inches from the east rail or east end of the step; that this screw was set in one of the grooves in the plate; that the top of the screw was level with the top of the ridges; that it was not down in the groove as were the other screws; that it had a bright shiny top on it; that "it had been walked on. Apparently it had been worn;" that it was loose in its hole; that it stood up the depth of the groove, which was about ¼ of an inch; that he reached down and with his fingers he was able to pull the screw up a little; that dust and dirt had accumulated under the head of the screw; that "it was kind of a little cone shape, there was a little cone of dirt under it, the dirt was in the groove."

On cross-examination he stated he saw no other screws sticking up; that there was but one screw that was raised up even with the ridges of the place; that it did not protrude above any part of the plate, but if one would step on the plate then, the screw would protrude above the plate an eighth of an inch; that this screw was about one-half way back in the plate or about two or two and ahalf inches from the south edge thereof and about 15 or 16 inches from the east end of the step.

Plaintiff's witness, Carroll, testified that he was an architect; that he examined the step after plaintiff's fall thereon; that he discovered that the "second step was loose from the steel tread. Q. How did you test that out, Mr. Carroll? A. Well, I merely walked down the step and I got a looseness, a vibration, when I stepped on this metal

tread;" that he examined the step and found that two or three of the metal screws were loose; that one of these metal screws had worked its way up level with the top of the tread and was very shiny, indicating that there had been traffic over the screw; that until the plate was stepped upon the screw did not protrude above the top of the tread. "When I walked on the tread that forced the screwhead up above the surface of the tread. . . . Well, I would say at least an eighth of an inch;" that he found considerable dirt and debris under the screw, "it was just the funnel shape of the screw;" that the screw would protrude above the level of the plate when the latter was stepped upon; that this screw was 16 inches from the east end of the step and perhaps 2½ inches from the south edge; that there was only one screw that "stuck up" but "I think I would be willing to testify that there must have been other screws loose to cause that condition;" that he examined the rest of the screws and found "some in the grooves and some missing entirely." When asked how much the plate moved when stepped upon, he said: "I think it would be rather difficult unless you had a micrometer, or something to guage that distance, to do that. . . . I wouldn't say it would be an infinitesinal distance, no;" that the plate "came up perhaps as much as the screw came up, might have been a fraction of an inch."

Plaintiff's witness, Dean, another architect, testified that he examined the plate after plaintiff fell on the step and found it loose; that he tested the plate by putting the ball of his foot on it and bringing his weight down on it; that "it made a hollow noise when you stood away from it and tapped the ball of your foot on it;" that he found a screw loose on the plate; that this screw was not "quite centered in the grove. It was a little bit riding on the lead part of the tread;" that the top of the screw was shiny; that it was loose and he could manipulate it with his fingers; that "you could wiggle it and raise it up;" that the screw would move laterally as well as up and down; that by throwing his weight on the plate the screw would protrude above the top of the plate about $3/32$ of an inch; that "you could make it protrude, the screw would rise one time, then when you would throw more weight on it, go down the next time;" that the screw was about 16 inches from the hand rail and about 2 inches from the front nosing of the tread.

On cross-examination he testified there was another screw loose, one behind the one in question, or slightly to the right and perhaps a little bit to the north of it; that as far as he was able to observe the rest of them were tight; that the plate would move when he stepped upon it; that the plate moved "over a sixteenth of an inch" down; that at times "the screw protruded, but after you got the screw up and you would do it two or three times, then the screw would move back down again. It all depends which way you started, with the screw up or with the screw down, which way it would move."

Plaintiff testified that the stairway was well lighted and she experienced no difficulty in seeing clearly the stairway; that as she walked down the stairway she was looking at the stairs and steps but saw nothing on them upon which her foot might have caught. Plaintiff did not see any screws sticking up. She testified that as far as she knew, and as far as she could see, the steps appeared to be in perfect condition. Her evidence does not disclose that she looked with any particularity at any part of the steps but looked at them, generally. She testified that, as she went down the stairs, the steps, including the second one from the bottom, felt perfectly solid when she stepped upon them. Plaintiff did not see and did not know what caused her to fall. There were no other persons using the stairway at that point at the time she fell and plaintiff did not examine the steps after she fell.

Defendant's witness, Thouvenelle, testified that he was superintendent of defendant's store; that he went over all parts of the store every day; that the repairs came under his supervision. He was asked: "Q. Now, Mr. Thouvenelle, will you tell the Court and the jury whether or not there have been any changes or any repairs of any kind made on this flight of stairs, particularly the second step from the bottom, since they were installed in August, 1935? A. No, sir, there have not. Q. Are they in the same condition now that they were in August, 1935, after they were completed and installed? A. Yes, sir, Q. And have been in the same condition continuously? A. Yes, sir, during that entire time;" that after plaintiff's injury "we tested the screws or rather the screw heads and found one which had a lateral play, that is, from left to right, but there is no up and down play to the screw at all, and neither could the screw head be turned, either tightened or loosened. . . . It was as originally installed. That screw head was not counter-sunk as deeply as some of the others, but neither could it be raised from the original position, and because it hadn't been countersunk as heavily as the others, it would still have this lateral play, but is couldn't be tightened or repaired unless the entire step was torn up and re-concreted and that re-set. Q. I will ask you whether or not you were able in any of these tests to get the screw head above the surface of the tread? A. No, sir, we were not;" that the only movement of the screw was from left to right; that the top of the screw was shiny from use; that it was not sticking up over the edge of the ridges in the tread; that the screw "was not countersunk as deeply when it was originally constructed;" that it was the original intention to have all of the screws below the top of the tread but not all of them were counter-sunk in the bottom of the groove; that the tread itself, had been worn down where the screw was even with the top of the tread; that this was the only screw that was shiny; that this screw was even with the top of the tread but was

not protruding; that it was higher than the other screws because it was installed originally higher.

Defendant's witness, Bovard, and many others, corroborated the testimony of the witness, Thouvenelle, in relation to the screw in question.

Defendant's testimony tends to show that "The amount of traffic going down the basement stairway has fluctuated from 500 to almost 4000 daily."

The petition alleges negligence in "that the said metal plates on the steps of said stairway, and the screws therein, were allowed to be and remain in a worn, loosened, dangerous and unsafe condition after the defendant knew, or by the exercise of ordinary care could have known, of said worn, loosened, dangerous and unsafe condition."

Defendant insists that its instruction in the nature of a demurrer to the evidence should have been given. In this connection defendant urges that the protrusion of the screw was so infinitesimal as not to constitute a defect in the step and defendant was not guilty of any negligence relative to the matter. Plaintiff was a business invitee and defendant owed her the duty of using ordinary care to have the premises in a reasonably safe condition and if there were any hidden dangers upon the premises to use ordinary care to warn her thereof. [Ilgenfritz v. Mo. Power & Light Co., 101 S. W. (2d) 723.]

This is a very close case on the facts and one that approaches near the border line of liability, but we think it was for the jury to say whether the protruding screw, in this case, constituted an actionable defect, the case being one where different minds might reasonably draw different conclusions in reference to the matter. [Rouchene v. Gamble Constr. Co., 89 S. W. (2d) 58, 61.]

The step in question was not only in disrepair, in that the screw, when the plate was stepped upon, would protrude approximately an eighth of an inch above the top of the groove in which the screw was set but, the screw, itself, was loose, as well as other screws. The plate rattled when stepped upon. The screw in question not only protruded an eighth of an inch above the plate when the latter was stepped upon but three-eights of an inch above the bottom of the groove and it was at the bottom that it was designed to be in order to perform its function in helping hold the tread tightly to the concrete base on which the plate was laid. There is some evidence that the screw was not designed, originally, to be in the bottom of the groove, but to the side. However, the evidence is conflicting in reference to this matter, and the evidence must be taken in its most favorable light to plaintiff, in ruling on the question as to the propriety of the demurrer to the evidence.

It is true that the defect in the screw would not have been a dangerous one if it had not protruded above the top of the corrugations in the plate. Yet, the whole situation was such as to have

brought home notice to the defendant that the step was in disrepair. The step was made particularly dangerous in that a person, not acquainted with it in descending the stairs would not know of the fact that it would give down when the plate was stepped upon and thus cause a screw to protrude. To one walking down the steps it presented a picture of safety in that no screw protruded above the plate whereas as soon as the plate was stepped upon the screw came up sufficiently to catch the heel of a shoe. We do not think that defendant should be exonerated on the theory that, as a matter of law, the defect was so infinitesimal that the defendant was not called upon to repair it.

Defendant says that the defect was so small that plaintiff's witness, Dean, stated it would be necessary to use a micrometer to guage the extent that the screw in question extended above the plate when the latter was stepped upon. There was substantial testimony for the attention of the jury that the screw protruded under circumstances making it dangerous, as before indicated, at least an eighth of an inch above the plate.

However, defendant says that the defect was so insignificant that plaintiff saw no loose or protruding screw as she went down the stairs and that the plate was solid when she stepped upon it; that the testimony of plaintiff's witnesses was to the effect that it would require the weight of an adult man standing on the tread in order for it to give down, and that there is no evidence that the weight of a woman would make it do so.

It is true, plaintiff stated she saw no screw as she went down the stairs. Her daughter said the same but said that when she descended the stairs she had just heard of her mother's fall and was in a hurry. She did not go down the side of the stairs used by the plaintiff. While the screw would have been seen below the plate by one making a careful inspection, it was not its position below the plate that made it necessarily dangerous. It was the fact that the screw was not in sight above the plate, until the latter was stepped upon, that is important and, as before indicated, that circumstance made the situation even more dangerous than had the screw protruded above the plate at all times. It is true, plaintiff said the step felt solid when she stepped upon it. However, the evidence shows that she was not anticipating any trouble with the step and paid no particular attention to it. In this regard she testified:

"Q. They felt perfectly solid under your step, did they? A. Well, I didn't feel of each step as I put my foot on, but I supposed they were all right and I walked down as I always do. Q. I am asking about the steps in the first flight. I say as you stepped down they felt perfectly solid to your tread as you walked down. A. Yes. Q. Nothing loose about them that you could see. A. No. Q. And as you walked on down the last flight, that is, the four steps from the landing into the basement, those also felt solid to your tread as

you stepped, did they not? A. Until I reached the second one. Q. Well, it felt solid to your tread also, did it not? A. I suppose, yes. Q. Beg pardon? A. Yes, it felt solid. Q. Well, then, all the steps felt solid to your tread, there was nothing loose that you detected by its give or anything as you stepped down? A. Well, I paid no attention to anything. Q. So far as you know then, they did feel solid to your tread, each of the steps that you stepped on, going completely down from the top until the time that you fell? A. Yes."

The fact that she did not notice that the plate was loose would not necessarily show that it was not loose, in view of all of the testimony. She was making no test to find out whether it was loose or not. Other witnesses, who testified that it was loose, made positive tests for the purpose of determining that question. Plaintiff was going down the stairs in the usual way without directing her particular attention to this one step, as to whether it was loose or solid. It was only an instant after she stepped on the plate until she fell and was injured. It had given down only an eighth of an inch and it may have appeared to her to have been solid when it was not. Defendant says that only the weight of an adult man could have caused the plate to give down. While, it is true, that only adult men tested the plate, there is nothing in the evidence to show that the weight of a woman would not bring about the same effect as the weight of a man. It was not the exact weight that was put upon the plate but the fact that it was stepped upon that caused it to move.

Both of the parties hereto have cited cases, none of which are on all fours with the case at bar as to the facts. In the case of Hellyer v. Sears, Roebuck & Co., 67 S. W. (2d) 584, cited by the plaintiff, a stairway in defendant's store was constructed with metal strips on the top of the steps. Plaintiff caught her heel in one of these strips and was injured. The evidence was that after plaintiff fell the metal strip was "raised up a little bit" and "stuck out." It was this that caught plaintiff's shoe-heel and held it so fast that in falling the heel was ripped from the shoe. It was held that these facts made out a *prima facie* case for recovery.

In Finn v. Terminal R. Ass'n. of St. Louis, 97 S. W. (2d) 890, plaintiff fell by reason of the heel of her shoe catching on a screw in a metal tread of a stairway. The screw protruded above the tread a distance of one-half inch and was bent over. The court held that the facts developed in the case were sufficient to show constructive notice to defendant. There was no claim that the defect was too small to be actionable.

Defendant has cited no Missouri case where the facts are at all similar.

In Ilgenfritz v. Mo. Power & Light Co., *supra,* the floor upon which plaintiff fell was slightly wavy and uneven and polished with wax. One could not determine that it was uneven by looking at it. It was

not more difficult to walk upon than a level floor. "Floors are not usually perfectly level." (l. c. 726.)

In Mullen v. Sensenbrenner Merc. Co., 260 S. W. 982, the crack was so small as to be negligible; the court stating, l. c. 984: "There are usually many cracks in floors of most large buildings, especially tile floors, as large as this crack, as shown by plaintiff's evidence." The court also said that the plaintiff knew as much about the floor as did the defendant. In Cluett v. Union Elec. Light & Power Co., 220 S. W. 865, plaintiff failed to show that the floor was wet and slippery where she fell. Maxwell v. Kansas City, 52 S. W. (2d) 487, was a sidewalk case. Plaintiff tripped over a section of concrete slab in the sidewalk 1¼ inches high. The court, l. c. 490, refers to the topography or the immediate surroundings making it impractical to have a sidewalk with a perfectly smooth surface. Sidewalk cases through little light upon the question now before us. In the case at bar we have a building to contend with, which was designed to have level floors and steps more easily maintained than ordinary sidewalks.

In O'Malley v. City of St. Louis, 119 S. W. (2d) 785, plaintiff tripped over a one-half inch elevation. The floor where plaintiff fell was unfinished, which was, or should have been, evident to persons using it, such as plaintiff.

The foreign cases cited by the defendant are different in their facts from the case at bar. In Frappier v. Lincoln Stores, Inc., 279 Mass. 14, it was held that the verdict was rightly directed for defendant because it was not shown where the tack came from or how long it had been on the step.

Chapman v. Clothier, 274 Pa. 394, involved a marble step. There was no depression in it exceeding $\frac{1}{16}$ of an inch. In Brace v. Kirby, 43 Pa. Super. Ct. 369, plaintiff had but one witness as to the alleged defect in the step. His testimony on the question was unsatisfactory.

The case of Johnson v. Fainstein, 219 Mass. 557, involved a three story building occupied by three families as tenants. Plaintiff, a member of one of the families, caught her foot on the stairs and fell by reason of her foot coming in contact with two nails projecting above the tread, one $\frac{1}{16}$ on an inch and the other $\frac{3}{16}$ of an inch. It was held that the nails did not amount to an actionable defect. However, there is nothing to indicate that the stops in that case were used as extensively as those in the case at bar. In fact the evidence is quite to the contrary. One would expect stairs used by from 500 to 4000 people daily (as here) to be in a better state of repair than those used by a few.

However it is contended that the defendant had no actual or constructive notice of the alleged defective condition which caused plaintiff to fall.

The evidence shows that these stairs were much traveled, being used as before stated, by from 500 to 4000 people daily. The evidence also

shows that the superintendent, who looked after the repairs in the store, went over the stairs every day. The defective condition of the step in question was not due to some foreign substance getting thereon but to a physical condition, that is, a state of disrepair. Taking the evidence in its most favorable light to the plaintiff it is apparent that there was sufficient therefrom for the jury to have justly arrived at the conclusion that the physical condition, in which the step was found, after plaintiff's fall, indicated that the defect was one that did not come into existence at the time of, or immediately before, plaintiff's fall but was of sufficient long standing to give defendant ample time in which to have discovered and repaired the same or withdrawn, from public use, that part of the step which was in disrepair. [Bailey v. Kansas City, 189 Mo. 502, 512; Harrison v. St. Louis-San Francisco Ry. Co., 339 Mo. 821; Hogan v. Kresge, 93 S. W. (2d) 118.]

However, it is insisted that plaintiff's evidence leaves the cause of the fall and injury entirely to conjecture and speculation; that it also fails to establish that the alleged defect was the proximate cause of her falling. In this connection, defendant points out that there was no one present, other than plaintiff at the time she fell, and that we must rely upon her testimony as to what then occured. Plaintiff testified that she saw no screw protruding above the plate and that the plate, itself was solid. Defendant points out that all of the evidence shows that the screw in question was not more than 2 or 2½ inches back from the front edge of the step; that plaintiff testified that the ball of her foot was resting on the step at the time her heel caught; that the place where her heel caught was 5 or 6 inches back from the edge of the step; that plaintiff made a mark on a photograph introduced in evidence indicating where her foot caught; that this mark shows that her heel did not catch where the alleged defective screw was situated; that the witness, Dean, also put a mark on the photograph where the screw was situated, which mark is a considerable distance nearer the south edge of the step than plaintiff's mark.

We have already had occasion to allude to plaintiff's testimony as to what she saw and did not see and as to the plate being solid. We need not discuss that matter any further. Plaintiff testified that her heel caught on something when she was between 12 and 18 inches from the left or south end of the step. Plaintiff's son placed the loose and protruding screw from 15 to 17 inches therefrom. The evidence shows that this was the only screw that protruded when the plate was stepped upon. Plaintiff's testimony shows that she did not catch her shoe on the edge of the step, or any other place, except on the top of the step; that her shoe was caught and held so that her body was twisted when she fell. The heel of the shoe, itself, showed a mark where it had been caught. It is true, that plaintiff's idea as to where her foot was at the time her heel was caught indicates that her heel was then 5 or 6 inches back from the edge of the step. However, this

was a mere estimate on her part. She had her right foot down on the lower step at the time her left foot caught and she immediately fell. Naturally, she would not know exactly the distance that her heel was from the edge of the step and could only estimate it by the feel of her foot. Owing to the fact that there was nothing else present upon which her heel could have caught, it is not indulging in speculation to conclude, under all of the circumstances, that it caught on the screw in question. As was said in Fowler v. South End Amusement Co., 12 N. E. (2d) 718 (Mass.): "Although plaintiff placed the defect at her right at some time, and her left heel was caught, there was evidence that the step was defective 'where she fell,' and that the defect could be found the cause of the fall. Even if the jury believed that screws, not nails, were used as fastenings, they could find the plaintiff merely mistaken in describing the fastenings as nails."

Defendant says there is no evidence that the plate and the screw were in the same condition at the time plaintiff fell as they were at the time they were examined by her witnesses. There was no evidence that her son arrived at the scene of the casualty about thirty minutes after she fell. It is not reasonable to suppose that the plate and the screw would have been so walked on or used during that interval of time as to cause any material change in them. No witness testified that there was any difference and the testimony of defendant's witness, Thouvenello, shows that there was no change from the time the steps were constructed to the time of the trial. The son testified that the condition was the same when the two architects examined it as when he first saw it. The fact that plaintiff indicated, by placing a mark on a photograph as the point where she fell, a different place on the photograph than the mark placed thereon by the witness as to where the defective screw was situated, is not conclusive. Either one or the other may have made a mistake as the photograph, itself, does not show distances. It contains no measurements. Therefore, the witness must have merely estimated the distances in relation to what was shown in the photograph. There was no effort made by the witnesses to indicate them in inches. When it came to distances, without reference to the photograph, the testimony shows that plaintiff fell approximately the same distance in inches from the east end of the step as the defective screw was located by her witnesses.

It is insisted that the court erred in admitting evidence as to nurse, hospital, medical and doctor bills, for the reason, plaintiff was a married woman without seperate estate or funds and, therefore, not entitled to recover for such items as damages. There is no merit in this contention. Plaintiff testified that the nurse, medical, hospital, doctor bills, etc., were charged to her and that they had been paid. She testified that the money used in the payment of these bills came out of a joint account kept by herself and her husband; that the money in this account came from his earnings and not hers, as her occupation

was merely that of housewife. Defendant says that her husband's money paid these bills and that the husband, alone, may sue for reimbursement. It was stated in McLean v. Kansas City, 81 Mo. App. 72, 75:

"The general rule in actions of this kind is that the wife can recover only for the pain and suffering which she endures and for the loss of strength and efficiency by reason of the injury. [Ross v. Kansas City, 48 Mo. App. 446; Thompson v. Railway, 135 Mo. 217.] But the wife may recover for medicines and medical attention where the charge therefor is made against her. In such cases these elements of damages are taken away from the husband and given to the wife." [See, also, Cowgill v. City of St. Joseph, 180 Mo. App. 327; Engleman v. Met. St. Rys. Co., 133 Mo. 514; Twedell v. St. Joseph, 167 Mo. App. 547.] In Irvin v. McDougal, 274 S. W. 923, cited by the defendant, there was no evidence that plaintiff paid or incurred personal liability for the bills.

While there is respectable authority, outside of this state, to the effect that a mere showing that necessaries were charged to the wife, does not absolve the husband from liability for them, that both of them may be liable (McKee v. Popular Dry Goods Co., 240 S. W. 567 (Texas) if, when such bills are charged to the wife, she may recover for them and such *recovery is taken away from the husband*, as stated in the McLean case, then if plaintiff paid the bills so charged to her she is entitled to recover for the items thereof and it is immaterial where she procured the money with which to pay them. This is no concern of the defendant.

However, it is insisted that there is no evidence that the charges for these bills were reasonable. The fact that they were presented and paid is some evidence of their reasonableness. [Abbitt v. St. Louis Transit Co., 104 Mo. App. 534; Wyse v. Miller, 2 S. W. (2d) 806.]

Complaint is made of a portion of the final argument to the jury by counsel for plaintiff. The part of the argument complained of is as follows: "Gentlemen of the jury, of course, it is unfortunate that we could not bring in the host of witnesses that they did. They almost depopulated the store over there bringing them over. We weren't in a position to see what went on over there. This stairway is in the care and the keeping of the defendant. They are the ones that had the opportunity to go down there, do what they would, and bring the people in here to testify about it. We don't know about it."

The record discloses that defendant had three or four times as many witnesses as to the alleged defect as plaintiff. Defendant, in its argument to the jury, called attention to the fact that "we have a lot of witnesses here" and stated a number of them had been from defendant's store. Defendant invited plaintiff's argument and there was no error committed in reference to the same. [Lilly v. K. C. Rys. Co., 209 S. W. 969.] In any event, we find no merit in the point raised

by defendant against the argument. Defendant cites a number of cases holding that where witnesses, or witness, are equally available to both parties, counsel will not be permitted to comment upon the failure of his opponent to produce such witnesses or witness. It appears that, in his argument, counsel for plaintiff was not criticising defendant for not producing witnesses but, rather he was saying that defendant had produced too many, if anything, and counsel was offering excuses for not producing more on plaintiff's side. However, defendant says that plaintiff caused several witnesses to examine the step and that defendant never made any objections to them or, anyone else on behalf of plaintiff, making any examination that they might desire. However, the facts were before the jury and plaintiff's counsel had a right to draw his own conclusions from them, whether right or wrong. The judgment is affirmed. All concur.