Olaf HAY, Respondent,

v.

Frances HAM, Appellant.

No. 23648.

Kansas City Court of Appeals.

Missouri.

Dec. 3, 1962.

———♦———

Vance Julian, William J. Cason, Clinton, for appellant.

Poague, Brock & Wall, Clinton, for respondent.

CROSS, Judge.

Plaintiff Olaf Hay sues Mrs. Frances Ham, defendant, to recover damages on account of personal injuries inflicted upon him when Mrs. Ham allegedly caused a parked automobile to start up suddenly, climb a curb, cross a sidewalk, crash into the interior of plaintiff's store and strike him.

The action was originally filed against Mrs. Ham and her husband, John Ham, as joint defendants. However, the petition was dismissed as against Mr. Ham before the jury was empaneled and the cause was tried against Mrs. Ham as the sole defendant. The trial resulted in a jury verdict and judgment for plaintiff in the amount of $10,000.00. Defendant has appealed.

The evidence in the case was introduced solely by plaintiff with the exception of a release document introduced by defendant during cross examination of plaintiff. Mrs. Ham testified only when called to the stand for cross examination by plaintiff's counsel. After plaintiff rested, defendant offered no evidence. We here note the essential facts and circumstances relating to the incident which caused plaintiff's injuries and damage.

On the 7th day of April, 1959, shortly before store closing time in the evening, Mr. and Mrs. Ham went to plaintiff's grocery store in their jointly owned automobile to pick up some previously ordered articles of merchandise. Mr. Ham drove the car and Mrs. Ham rode in the right front seat as a passenger. Upon arrival, Mr. Ham parked the vehicle in a regular diagonal parking space in front of the store, got out of the car, and left the motor running with the gears of the automatic transmission engaged. Mrs. Ham also got out of the car, received some articles of merchandise delivered to her by Isabel Burry, a store employee, put them in the back seat and re-entered the front seat of the automobile on the right side. After inviting Isabel Burry to ride home in the car, Mrs. Ham then "scooted" over to the center of the front seat to make room for the intended passenger. She moved both her body and feet and put her feet on the "hump that's in the middle". The motor began to "race" and the automobile ran forward, climbed the curb which was 5 inches high, traveled across the 12 foot wide sidewalk, crashed into the store to a distance of approximately 9 feet inside the building, knocked out approximately 15 feet of the store front, ran against Mr. Hay, pushed and rolled him against various parts of the store, knocked him to the floor, rendered him unconscious and inflicted substantial injuries upon him. The store and contents were extensively damaged.

There is no direct evidence to show what made the engine accelerate and the car run forward. At the time of the occurrence only Mrs. Ham was in the automobile. She admitted she didn't know whether or not her foot hit the accelerator, and was unable to say what caused the car to run forward. However, plaintiff testified that after the accident, at the store, Mrs. Ham made the statement that "her foot slipped off the hump onto the accelerator". Mrs. Ham did not deny that she made the quoted state-

ment. No contention is made on behalf of defendant that plaintiff failed to make a submissible case of negligence.

The evidence further shows that on July 24, 1959, and prior to filing this suit, plaintiff compromised with defendant certain elements of his cause of action, accepted the sum of $6500.00 in settlement, and executed a written release accordingly. The release provided, in part, as follows: " * * * said release including loss of time and profits and expenses of any character whatsoever, except medical, hospital, and nursing expenses of the said Olaf Hay, and except damages for personal injuries to the said Olaf Hay. It is understood and agreed, however, that this release covers loss of all merchandise, cash, produce, fixtures, extra help, miscellaneous hauling, extra salaries, loss of profit, loss of earnings to date, replacement help, and other items * * * ". It is evident from the terms of the release that plaintiff did not settle and release his claim for damages for "personal injuries", "medical, hospital and nursing expenses", and "loss of earnings" *from and after the date of settlement*. The release was introduced in evidence by defendant during her cross examination of plaintiff as above noted.

In submitting the case to the jury, the trial court gave plaintiff's verdict directing instruction (No. 1), the entire text of which we here quote:

### "INSTRUCTION NO. 1

"The court instructs the jury that if you find and believe from the evidence that at about 6:00 p. m. on April 10, 1959, Defendant, Frances Ham, was sitting in the 1955 Chrysler mentioned in the evidence which was parked in the public street adjoining the curb in front of the Penny Grocery on the North side of the Public Square in Clinton, Missouri, if so, and that at that time Plaintiff was standing within and near the front of the Penny Grocery Store, if you so find, and if you further find that at said time and place, Defendant Frances Ham, stepped on the accelerator of said Chrysler and caused the Chrysler to suddenly move forward, over the curb, onto the public sidewalk, and through the front and into the private property of the Penny Grocery Store, if so, and that in so doing Defendant Frances Ham failed to exercise the highest degree of care, and was thereby negligent, if so, and if you find that such negligence directly caused the Chrysler automobile to strike the Plaintiff, if so, and cause injuries to the person of the Plaintiff, if so, then your verdict should be in favor of the Plaintiff, Olaf Hay, and against the defendant, Frances Ham".

Defendant first complains that the giving of Instruction No. 1 was error because that instruction incorrectly informed the jury it was defendant's duty to use the highest degree of care, when, under the noncontroverted facts in evidence, it was her duty to exercise only ordinary care. It is defendant's contention that Section 304.010 V.A. M.S., which requires that "Every person operating a motor vehicle on the highways of this state * * * shall exercise the highest degree of care, * * * " does not apply to her in this case for the reason that she was not "operating" the automobile when it was caused to run forward. She insists that Mr. Ham was still the "operator" of the car after he parked it in gear, left the motor running and left the car, and argues that even if she let her foot slip and hit the accelerator pedal and so caused the car to move ahead, that occurrence was only an isolated and unintentional act on her part that would not amount to "operating a motor vehicle" under the statute's provision. Our decision of this assignment must be made without benefit of any previous decision bearing directly on the question. None has been cited by either party, nor has any been found by our research.

The foundation of legislative intent in the enactment of Section 304.010 is "to require users of motor vehicles upon

public highways to exercise the highest degree of care". Lafferty v. Wattle, Mo.App., 349 S.W.2d 519. The underlying purpose of Section 304.010 (and of related enactments) is the protection of life, limb and property of all persons from destruction or damage resulting from the operation of motor vehicles on the public highways. See Teters v. Kansas City Public Service Co., Mo.Sup., 300 S.W.2d 511. It is the duty of our courts to reasonably interpret Section 304.-010 so that the legislature's purpose in enacting that law shall prevail and not so as to defeat the obvious intention of the lawmakers. Nicholas v. Kelley, 159 Mo.App. 20, 139 S.W. 248. It is a matter of common knowledge and universal concern that the millions of motor vehicles operating daily on our highways constitute one of the deadliest and most destructive agencies in our present society.

In construing Section 304.010 Missouri courts have given a broad interpretation of the term "operating". To illustrate that a narrow, literal construction of the word is not favored, we note the following decisions: In Teters v. Kansas City Public Service Co., Mo.Sup., 300 S.W.2d 511, a delivery truck driver parked the truck, went into a store, returned to the truck, climbed in the rear of the vehicle and opened the rear door, causing it to come into contact with a passing bus. In so doing, the driver was held to be "operating" the truck. In Phillips v. Stockman, Mo.App., 351 S.W.2d 464, the driver of a stalled automobile "pulled over" to the side of the road, got out of the car and looked under the hood. It was held that he was still operating the car. In Karnes v. Ace Cab Co., Mo.App., 287 S.W.2d 378, the driver stopped a taxicab and opened the cab door. A child passing on a bicycle struck the door and was injured. The court held that the cab driver was an "operator" when he opened the door. Stewart v. Jeffries, 224 Mo.App. 1050, 34 S.W.2d 560, is another case in which the automobile stalled and the driver got out and looked under the hood. The court said he was an operator, while so

doing when another vehicle crashed into the rear of the stalled automobile. Likewise, in Thaller v. Skinner & Kennedy Co., 233 Mo.App. 1081, 130 S.W.2d 244, a woman who had stopped her car for a traffic signal was considered as an operator when a truck ran into the rear of the stationary vehicle.

Many shades of meaning have been given to the words "operate", "operator" and "operating" by dictionaries and text writers. Both parties have submitted, from those sources, various general definitions of the words in question. However, we turn to Missouri decisions for the definitions that are applicable to the precise issue involved.

■ Our courts have consistently defined the word "operating", as used in Sec. 304.-010, in the following language: "The word 'operating' or 'driving' of a motor vehicle within the statute requiring the highest degree of care encompasses all acts necessary to be performed in the movement of a motor vehicle from one place to another". Thaller v. Skinner & Kennedy Co., supra. And, in Daniel v. State Farm Mutual Insurance Co., 233 Mo.App. 1081, 130 S.W.2d 244, in determining whether a certain person was a motor vehicle operator, this court said: "The word 'operate' according to Webster's Dictionary is to 'produce an effect, to cause to effect, to bring about'". Additionally, we note that Webster's Third New International Dictionary defines "operate" (when used as a transitive verb) as "to cause to occur" and "to cause to function". And, we find a definition of the word "operator" in our Motor Vehicle Safety Responsibility Law. Section 303.020, V.A.M.S., defines the word as "a person who is in actual physical control of a motor vehicle".

■ In view of the decisions we have referred to and the quoted definitions, and having in mind the remedial purposes of Section 304.010, all in the interest of public safety and welfare—we conclude that defendant was "operating" the automobile when it was propelled forward into plaintiff's store and against his person. It is a reasonable inference, permissible under the

evidence, that the car lunged forward as the result of defendant's foot applying pressure on the accelerator. That act on the part of defendant (whether intentional or not) was an "act necessary to be performed in the movement of a motor vehicle from one place to another"—and, therefore, it was an act which "The word 'operating' or 'driving' a motor vehicle within the statute requiring the highest degree of care encompasses * * *". Thaller v. Skinner, supra. And, in our opinion, it cannot be reasonably argued that defendant did not "produce an effect", or that she did not "cause", "effect" or "bring about" the movement of the vehicle resulting in plaintiff's injuries. It is equally apparent that when defendant exerted the force that started the automobile she immediately became a "person who is in actual physical control of a motor vehicle". Section 303.010 V.A.M.S.

We see no validity in defendant's argument that the incident was isolated and unintentional. The frequency or infrequency of an automobile's use by a person is no standard by which his duty of care is measured. Nor is defendant to be excused from exercising the highest degree of care because her act causing the car to move forward might have been unintentional. No such exception is found within Section 304.-010. Defendant is no more entitled to the immunity than is any other operator, who might unintentionally step on the accelerator instead of the brake pedal when he is seated under the wheel and at the controls; or a driver who inadvertently fails to observe a stop signal or unintendedly violates any other of the numerous regulations imposed on automobile operators in the interest of public safety.

Our final comments relate to defendant's acts leading up to her propulsion of the car on its brief, but tragic course, and to her conduct during that journey. It is reasonably apparent that when she "scooted over in the seat" and "put her feet on the hump", she deliberately placed herself in juxtaposition with the controls of the automobile. She then knew (or should have known) that the car's engine was running and that it might run forward if she pressed the accelerator. She was potentially an "operator", and became one when her foot slipped off the hump and depressed that control. She was then the sole and only person who had any ability or means to control the vehicle she had launched into motion. She was the "operator" in charge. Certainly, at that time, she owed the highest degree of care to use *available* means to prevent injury and damage—such as taking her foot off the accelerator, applying the brakes, or, possibly, turning the wheel and steering the car away from plaintiff.

There was no error in the giving of Instruction No. 1 as above charged.

■ The second assignment is a complaint also directed against Instruction No. 1. Defendant claims that the instruction is erroneous because it fails to hypothesize facts sufficient for a finding of negligence. Defendant says the only fact hypothesized is that "defendant * * * (negligently) * * * stepped on the accelerator of said Chrysler and caused the Chrysler to suddenly move forward, over the curb * * *". In addition to the foregoing, defendant insists that the instruction should have required findings that defendant knew or should have known that the car (engine) was running and was in forward gear and would move forward if the accelerator was pushed, and, that defendant knew or should have known that the car would climb the curb and run into the store if the accelerator was pushed. We find no merit in the contention. The factual hypothesis contained in the instruction was a sufficient submission of the issue of defendant's negligence. The submission was in terms of the averments of negligence pleaded in the petition and in accordance with the undisputed evidence tending to establish defendant's negligence as pleaded. See Hooper v. Conrad, 364 Mo. 176, 260 S.W.2d 496, wherein the Supreme Court said:

"Where there is no divergence in or denial of the essential facts, then the

ultimate issue of the negligence pleaded and its being the proximate cause of the injury or damage alleged may be submitted by reference to the facts and circumstances shown by the evidence without specific hypothesization in the instructions. And, we may add, that if either of the parties deems a hypothesized fact or situation not to have been clearly or sufficiently hypothesized in any instruction, he should offer a clarifying or amplifying instruction".

We further observe, in support of our present ruling, that at the trial defendant did not offer any clarifying or amplifying instruction incorporating the additional facts she now suggests should have been submitted in Instruction No. 1. Having not done so, she will not now be heard to say such facts should have been included in the instruction.

Defendant next charges the trial court with error in giving Instruction No. 2, the measure of damage instruction, which reads as follows:

"The court further instructs you that if you find the issues herein submitted to you in these instructions in favor of Plaintiff, Olaf Hay, then it will be your duty to assess as damages in his favor such sum of money as you find from all of the evidence will fairly, fully and reasonably compensate him for such injuries, and damages, if any, as you find from the evidence that Mr. Hay suffered in the past and is reasonably certain to suffer in the future as a direct result of the occurrence mentioned in evidence, except such damages, if any, as were released by the release of July 24, 1959".

Defendant's specific complaint of the instruction is that it was error for the trial court to permit the jury to interpret the legal effect of the release described in the instruction. Instead, defendant urges, the legal construction of the release was for the court, and that "having, at plaintiff's request, undertaken to instruct on the dam-

ages and the release the court should have told the jury what damages were released by the document and should not have left the legal construction of the document with the jury".

■ In asserting the foregoing complaint defendant has made a radical departure from her trial theory. Immediately prior to plaintiff's opening statement, counsel for the parties conferred with the trial judge about the release. Plaintiff's counsel at that time inquired of defendant's counsel as to the release, and how they wanted to proceed with it. To that inquiry, defendant's counsel made statements as follows:

"The document is here, can be put in evidence".

"Certainly we're entitled to have the jury know that we have paid for those damages which are released by the document. The document speaks for itself".

"The document will speak for itself. Let the document go in".

"I think the document will speak for itself as to what it says".

"I think it speaks for itself".

"I think it will get before the jury".

In accordance with the stated views of her counsel, defendant introduced the release in evidence and exhibited it to the jury. Plaintiff testified and was cross examined at length concerning what was covered by the release. Counsel for both parties discussed the effect of the release in argument to the jury. Throughout the trial both parties treated the release controversies as issues to be heard and resolved by the jury. This procedure was adopted and followed at the vigorous insistence of defendant's counsel. The jury submission of those issues (now complained of) was invited by the position taken on behalf of defendant by her counsel and is consistent with their views expressed at the beginning of the trial.

█ Although defendant is not entitled to a review of the present question because she now presents a different theory than she did at the trial, nonetheless, we have considered the assignment and rule that the instruction is free from the attributed error. It is a correct statement of the law as applied to the facts in the case, contains no mis-statements or mis-direction of law, and, in our opinion, enabled the jury to arrive at a just evaluation of plaintiff's damages. As we said in Samuels v. Illinois Fire Insurance Co., Mo.App., 354 S.W.2d 352, "Where an instruction on the measure of damages, though general, is not erroneous in its general scope, its generality does not constitute error, and if the defendant fears such instruction may be misunderstood, he must submit an explanatory or modifying instruction or he will not be heard to complain".

█ Again complaining of Instruction No. 2, defendant argues that it erroneously allowed the jury to compensate plaintiff for injuries and damages he may (with reasonable certainty) suffer in the future. Defendant admits "there is some evidence of a permanent physical condition", but insists there is no evidence to establish the cause of that condition. There is no basis for this contention. Plaintiff described in detail the observable injuries he received *as a result of the automobile striking him,* which included cuts on his head, arm and elbow; a fractured knee (left) cartilage; a fracture of the fibula of the right leg; a five to six inch cut on one side of the right leg and a puncture wound in the opposite side of the same leg. Plaintiff testified that at the present time he has "a coagulated muscle or adhesions of the muscle" * * * "a puffed place on the muscle part right above the bone of my (right) leg where the muscles work". The injured muscle referred to by plaintiff was described from a medical standpoint by Dr. Bradshaw, testifying on behalf of plaintiff, as a "herniated muscle with bleeding into the muscle so that it formed a blood clot". Dr. Bradshaw testified that condition was permanent

and disabling. The only reasonable inference the jury could make under these facts is that the described (and admitted) permanent injury resulted from the automobile's impact upon plaintiff. There is no evidence in the record to support any other possible hypothesis of cause. Plaintiff has sufficiently established a causal connection between the proven occurrence and the undisputed permanent injury.

Defendant next contends the trial court erred (1) in permitting plaintiff to testify as to the amounts he had paid out for medical expenses and as expenses incurred in traveling to procure medical treatment when there was no evidence that those expenses were reasonable or necessary, and (2) in refusing to give an instruction requested by defendant withdrawing from the jury consideration of the testimony relative to those items of expenditure. Plaintiff testified that he had paid bills for medical expenses in the total sum of $751.04, which he itemized as follows: "Dr. McIntyre $76.00, Dr. Glaspy $10.00, ambulance $10.00, hospital (nine days residence, X-rays, orthopedic appliances, medicines and services) $182.95, Kreisler Drug Store (for elastic knee and leg bands) $23.59, (Dr.) Hugh Walker $109.40, $4.00 to (Dr.) Hugh Walker, (Drs.) Dickson and Diveley $75.00, (Drs.) Max Berry and Brown $80.00, trips to Kansas City, (4 trips from Clinton to Kansas City and return), $120.00, crutches $20.-00, and for lounge bed (required during convalescence) $35.00 * * *". Plaintiff described in detail the medical services rendered by the doctors and further testified that the listed expenses were incurred solely because of the injuries he received in "this accident".

█ Defendant correctly asserts that there must be some substantial evidence to show that the value of and the charges for doctors' services and related items are reasonable before such expenses incurred may be considered by the jury in assessing damages. Such proof may be made by inference from the circumstances

attending the expense transactions as well as by direct evidence of value. In this case the fact that the enumerated items of charge were submitted to and paid by plaintiff is some substantial evidence of their reasonableness. See Myers v. Karchmer, Mo.Sup., 313 S.W.2d 697; Stewart v. Geo. B. Peck Co., 234 Mo.App. 864, 135 S.W.2d 405; Abbitt v. St. Louis Transit Co., 104 Mo.App. 534, 79 S.W. 496; Wyse v. Miller, 222 Mo.App. 165, 2 S.W.2d 806. The rationale of our ruling is expressed by the Supreme Court in the following quotation from Cordray v. City of Brookfield, Mo.Sup., 88 S.W.2d 161:

> "* * * when it is considered that the evidence was that his services had continued at regular intervals over a period of four or five years; that he was a reputable physician; that there was no evidence tending to show collusion or bad faith; that defendant did not question the reasonableness of the account; and that the plaintiff acknowledged the indebtedness; we think the evidence must be taken as affording a basis for a fair inference that the charges were reasonable. Nothing whatsoever to the contrary appearing, we must presume and ascribe honest motives, good faith, and right conduct".

We rule additionally that there is sufficient evidence to support a fair inference that plaintiff's medical expenses were necessarily incurred. The necessity for the medical treatment afforded plaintiff's injuries is clearly obvious from their nature and extent as detailed in evidence. See Myers v. Karchmer, Mo.Sup., 313 S.W.2d 697. In permitting the plaintiff to testify as to his medical expense, and in refusing to give an instruction withdrawing that testimony, the trial court ruled appropriately.

Defendant's next assignment it that the court erred in refusing to strike the testimony of Dr. Bradshaw and in refusing to withdraw that testimony from the jury's consideration. This point is essentially a repetition of one we have previously dis-

cussed. Defendant again argues that plaintiff has established no causal connection between the accident and the conditions of injury found by Dr. Bradshaw. On that premise defendant contends there was no foundation for the admission of Dr. Bradshaw's testimony.

Dr. Bradshaw made a physical examination of plaintiff a few days before the trial and testified as plaintiff's medical witness. Describing the examination, the doctor stated that it was limited to "the things I could learn from observation, by measurement (and) by X-ray examination also". His testimony was likewise limited. Testifying from personal knowledge, Dr. Bradshaw narrated a factual description of plaintiff's injuries as he actually observed and diagnosed them by examination, and expressed the medical opinion that the muscle injury suffered by plaintiff was permanent and disabling. We are unwilling to say that evidence of such pointed relevance was inadmissible, as defendant insists, merely because it did not encompass within itself all the elements of proof necessary to establish the required causal connection between the accident and the injuries complained of. Dr. Bradshaw's testimony is material and relevant because it tends to establish the terminal condition of injury to which the cause is connected by other evidence, as we have previously noted. Nor, as also suggested by defendant, was it incumbent upon Dr. Bradshaw to base his opinion testimony upon facts submitted to him in hypothetical questions. An expert witness is permitted to express an opinion based upon facts within his own knowledge and observation. See Schears v. Missouri Pacific Railroad Company, Mo.Sup., 355 S.W.2d 314. We find no impropriety in the trial court's rulings.

Defendant complains of error in the trial court's refusal to grant a mistrial after the occurrence of two trial incidents— the first of which occurred as follows: On direct examination plaintiff testified that after the accident he operated his

grocery store until he sold it on May 1, 1960. He was thereafter asked by his counsel to state the reason for selling the store. Plaintiff answered "From the doctor's orders that I * * *". The answer was interrupted by defendant's objection and a motion to instruct the jury to disregard the question. The court sustained the objection and instructed the jury to disregard the answer, and denied defendant's request for a mistrial.

The second incident complained of arose from an offer of proof made on behalf of plaintiff. During the plaintiff's direct examination, he was requested by his counsel to "pull up his pant's leg so that we can exhibit your leg to the jury". Defendant objected to the exhibition and the court sustained the objection. Thereupon, in the jury's presence, plaintiff's counsel requested "permission to exhibit the leg to the jury for the purpose of showing them the condition of this leg and to show that there is a puffed place below the knee, extending there, for the purpose that this jury can see it itself, it is perfectly visible". Defendant then moved for a mistrial on the ground that the offer of proof was inflammatory to the jury. The trial judge denied both plaintiff's offer of proof and defendant's motion for a mistrial.

The allowance or refusal of a motion for a mistrial rests generally within the discretion of the trial court. The appellate court will not interfere with the trial judge's action unless it appears that he has abused the broad discretionary power granted to him by the law. Lithegner v. City of St. Louis, Mo.App., 125 S.W.2d 925. We are not convinced by our review of the trial incidents in this case that defendant suffered any manifest injustice from the denial of her motions for a mistrial, or that such action by the trial judge was an abuse of his discretion.

In her final point, defendant insists that the verdict of $10,000.00 was excessive and resulted from the jury's bias and prejudice. It is shown by the evidence that when defendant's automobile struck plaintiff he received a cut on the head extending across his right eye requiring 13 stitches, bruises, a cut on his right elbow and right arm, a fractured cartilage of the left knee, a cut five to six inches long on one side of the right leg, a puncture wound on the other side of the same leg, and a broken leg bone below the right knee. He sustained a tear in the fascial compartment of the right leg permitting the leg muscle to push through with bleeding into the muscle itself—an injury still present at the time of trial and diagnosed as a herniated or ruptured muscle with interior bleeding which had formed a blood clot. In the language of Dr. Bradshaw, "The bleeding into the muscle itself has clotted so that now Mr. Hay has a piece of muscle that is damaged and has blood accumulated in this piece of muscle that has pushed its way out through the fibrous covering". The lump caused by this condition is five inches long and two inches wide. The described muscle injury and blood clot are permanent. No improvement is expected and surgery is not advised. Plaintiff testified that the leg puffs and swells from standing, that he suffers continual pain from it and that he can't stand on it any length of time. "It puffs and swells on me from standing". Dr. Bradshaw testified that the injury will cause plaintiff difficulty with any activity that requires the use of the leg muscle group—illustratively, standing for long periods of time and climbing steps—and, that he was not able to stay on his feet regularly in 8 hour day employment without discomfort. Plaintiff was hospitalized 9 days for treatment of his injuries and remained at home for approximately 30 days before returning to the store—confined to his bed for two weeks, and in a wheel chair the rest of that time. At the store he used the wheel chair for a week and thereafter used crutches for about a month. Because of his injuries plaintiff had to hire extra help to run the store, for which he paid out wages in the total sum of $2,363.52

*from and after the date of the partial settlement.* As appears above, plaintiff expended the sum of $751.04 to pay his medical expenses.

The evidence bearing on the question of plaintiff's loss and damage justifies the award. There is nothing before us to indicate that the verdict resulted from any bias or prejudice on the part of the jury.

The judgment is affirmed.

All concur.