JOSIE MOSES v. INDEPENDENCE, MISSOURI, A MUNICIPAL CORPORATION AND KANSAS CITY PUBLIC SERVICE COMPANY, A CORPORATION.— 188 S. W. (2d) 538.

Kansas City Court of Appeals. June 11, 1945.

362

*Charles L. Carr* and *Cowgill & Popham* for appellant Kansas City Public Service Co.

364

*John F. Thice, Clay C. Rogers* and *Price Wickersham* for appellant City of Independence.

*Schultz & Bodney* and *Walter A. Raymond* for respondent.

CAVE, J.—This is an action for damages for personal injuries. Plaintiff recovered a judgment against both defendants for $3350. Defendants took separate appeals; but by consent of all parties the appeals were consolidated and will be treated as one case.

According to plaintiff's petition, she was injured October 1, 1941, while alighting from a bus of defendant Kansas City Public Service Company at its stopping place on the south side of Lexington Avenue just west of Osage Avenue in the City of Independence. She charges that Lexington Avenue was paved with asphalt and that for a long time prior to the date of her injury "there was a defect in said street consisting of a rough, wavy, lumpy and uneven raised place and hole or depression on said Lexington Street of the following dimensions and description: Eight feet long in an east and west direction and between one and one-half and two feet in a north and south direction and raised up between four and six inches with a depression surrounding said area. That at the north edge of said area and about midway of it was a deeper depression four to six inches deep and about ten to twelve inches square. That said condition above described was located in said Lexington Street approximately thirty-two feet west of the west curb of said Osage Avenue and approximately at the south curbing of said Lexington Street. That it was located directly in front of a driveway to a 'Conoco' gasoline filling station located on the south side of said Lexington Street and at Osage Avenue." She charges the defendant City of Independence with notice of said defect and failure to repair, failure to barricade the defect or failure to warn of said defect.

As to defendant Kansas City Public Service Company she charges it "had provided a regular bus stop for its eastbound busses on said Lexington Street on the south side of said Lexington Street near Osage Avenue and that by stopping at said regular bus stop persons alighting from said bus would not be required to walk over the defect in said street above described, as the place where persons would regularly light when busses would stop at their regular bus stop would be some distance removed from the defect in said street. That on October 1, 1941, at seven A. M. plaintiff, who had previously boarded one of said busses and paid her fare and became a passenger on it, was in the act of alighting from said bus at the above location and by reason of the operator of said bus negligently failing to stop at the regular bus stop but instead stopping with the door of the bus through which persons alighted directly over the defect in said street and on said date, while plaintiff was alighting from said bus, she stepped directly from said bus onto the said defect at the point of said deep depression or a hole in the street, causing her foot to turn.

". . . That the defendant's bus driver negligently stopped his said bus with the door, through which persons, including the plaintiff, had to alight, in close proximity and directly against and over said defect and negligently failed to furnish the plaintiff with a safe place upon which to alight and negligently failed to stop his bus at the regular stopping place."

Defendants' separate answers consisted of general denials and pleas of contributory negligence.

For brevity, we shall refer to the defendants (appellants) as the *city* and *bus company*.

Both defendants contend that their demurrers to the evidence should have been sustained because plaintiff failed to make a submissible case. There are other assignments of error, which are considered *infra*.

The scene of the accident was near the intersection of Osage Avenue and Lexington Avenue in the City of Independence. Osage is a north and south street and Lexington is an east and west street. There is a filling station located on the southwest corner of the intersection with a driveway into said station from Lexington Avenue, which avenue is paved with a concrete base and an asphalt surface. The driveway is twenty-five or thirty feet wide without any curbing at that point, but the approach from the gutter of the street up to the grade of the sidewalk and driveway is a rise of several inches. The bus company had a regular stop to receive and discharge passengers on Lexington Avenue near the filling station. This accident occurred about 7 A. M., October 1, 1941. Plaintiff was a passenger on one of defendant's busses, which was being driven east on Lexington. The bus had two exits for passengers; one at the front and the other about the middle of the righthand side of the bus, which is referred to in the evidence as the "rear door." Plaintiff left the bus through the middle or rear door, which was in front of the driveway into the filling station. In the street, and about six or eight inches from the curb line, there was a rough, uneven and depressed surface which was about eight feet long and one and one-half or two feet wide and parallel with the curb line.

Mr. Zimmerman, who had operated the filling station for about twelve years prior to the time of the accident, described the surface of the street at the point in controversy in this way: "Well, there was quite a depression there in the street and quite a roll-up place where the asphalt had been pressed out and rolled up to the edge. It made quite a depression and bump there. It was right where the buses would always stop the back wheels. . . . Crossing over it quite often coming in from the north, cars would go over that place. It was quite a jolt for them. . . . It would get worse in hot weather. . . . Q. How deep would you say it was at the deepest part of that hole? . . . I don't know. I would just have to esti-

mate it. I believe the depth of *the hole* could be estimated all the way from one to three inches deep, that is *the hole* itself. Q. The place where it was piled up how high would that be? A. From the top of the ridge to the bottom of *the hole* it could run all the way from three to five or six inches I believe. . . . Q. How long would you say that condition existed there before October 1st, 1941? A. Well, I would say, of course it probably wasn't that bad, but I would say about between six months and a year it had been getting in that condition. . . . Q. . . . . This general depression, was it in this place where there had been a previous patch? A. Yes, sir, it was an area there that had been previously patched."

Mr. Mack described the depression as being "pretty rough; . . . there was a variation of about six inches there. . . . It was abrupt at one place. Q. That was the deepest place? A. Yes." Mr. Kirkham described the situation in this manner: ". . . There was *a hole* there and it had a ridge on the side of it, on the south side, it was on the south side of the street and it was *a hole* approximately 3 inches deep, *the hole* was, but the ridge was approximately, oh, approximately 6 inches high. Q. That deep from the bottom of *the hole* to the top of the ridge? A. No. Together *the hole* and the ridge was about 8 or 9 inches high. Q. What did that look like then in the street? A. It just looked like *a hole* in the street." That condition had existed since he went to work at the filling station in the spring of 1941.

Mr. Schultz, one of plaintiff's attorneys, testified: "I measured the hole and the depression at Lexington and Osage avenue I think a couple of weeks after the accident, and found these measurements, an area that was depressed, and it was eight feet long in an east and west direction and between one and a half and two feet in a north and south direction. This area was 32 feet west of the west curb of Osage avenue and at or near the south curb line of Lexington street. At the north edge of this area and about midway of it was a deeper depression varying from four to six inches in depth and this particular place was about ten to twelve inches square."

Plaintiff testified that the bus stopped near the east part of the driveway to the filling station and alongside the curbing, or where the curbing would have been if it had extended across the driveway; there was only one other passenger, a man, on the bus at that time. He left by the front door; she left by the side or rear door, and as she started to leave the bus she looked down and saw nothing unusual; she stepped down with her left foot, with her right foot on the step of the bus, ". . . when I picked up my right foot to step I brought it down and then went to step again and couldn't get off, fell. Q. What happened to your left foot then? A. It was in a hole there, a little hole there. . . . Q. And as you were lifting your right foot up to put it down you fell down? A. I fell down

and my left foot was in the hole. . ., . Q. Did you take any steps at all before you fell—after stepping down from the step of the bus? A. No, sir. . . . Q. After you were picked up from the street, did you then see what caused you to fall? A. Yes, sir. Q. What was it? A. There was a hole there. Q. Where was that hole? A. At the curb, where the curbing should have been. Q. That is where the driveway was? A. Where the driveway was. Q. What was there next to the hole? Where the hole went down was there anything on the side of it? A. There was a rough place there. Q. And how was the general area? A. Sunken place. Q. It was sunken? A. Yes, sir, and hole. Q. How close was the step of the bus to this hold as it was when you were getting off of it? A. Well, in my estimation it was about six inches. Q. So that it would be directly underneath the step, is that right? A. Yes, sir." Plaintiff's injuries will be noted later.

Defendant bus company produced Mr. Graves, who was the other passenger on the bus. He testified that he got off by the front door; that the front end of the bus had stopped at the usual stopping place; that as he stepped off the front end, the plaintiff stepped off the back end, took a couple of steps and fell; that he called to the bus driver to stop, which he did, and came back and assisted plaintiff to her feet; that the bus was stopped at an angle of the curbing so that the rear end extended into the street; plaintiff was a good two or three feet from the bus when she fell; he could not say exactly; the back end of the bus was out from the curb line when it stopped, possibly two or three feet. The bus operator testified that he stopped at the regular stopping place at the corner; that he pulled in at an angle and the rear end of the bus was five or six feet out in the street; he stopped with the back end of the bus out in the street so that passengers alighting would avoid the rough and rolling condition in the pavement; there was no rough condition at the point where plaintiff stepped off into the street; she took several steps to the south after alighting and then fell to a sitting position on the pavement; she was then about four feet from the bus stop; he assisted her to the filling station and obtained her name and that of Mr. Graves. On cross-examination he testified: "Q. So from your own knowledge you wouldn't know whether she took a single stap, would you? A. No, I guess not. Q. At the place where your bus stopped and the door opened was directly opposite this bad place in the street, wasn't it? A. Yes, sir, I believe it was. Q. And you knew about this bad place for a year or more before that accident? A. Yes, sir. Q. And it was in violation of the company rules to stop your bus in a place where there was a bad place in the street? A. That is right. Q. And for that reason you tried to avoid it as much as you could? A. Yes. Q. This was a cloudy morning? A. Yes, sir. Q. Of course, if it is a cloudy morning and gray pave-

ment it is hard to see, wouldn't that be natural? A. Yes, sir. Q. You wouldn't want the jury to say that this was broad daylight? A. I wouldn't say . . . Q. And the place where this lady was sitting when you finally came around there was directly over this bad place in the street? A. There was a rolly place there. Q. And that is exactly where she was sitting? A. Yes, sir. Q. And you say you observed that about a year before that accident? A. I think so. . . . Q. You considered that place dangerous for people to get off, didn't you, and that is the reason you tried to avoid it? A. Yes, sir.''

Defendant city introduced evidence to the effect that there was no "little hole" six or eight inches deep and ten to twelve inches square at the place of the accident. Its witnesses described the surface as being wavy, caused by the asphalt rolling up, but not dangerous.

Defendant bus company contends its demurrer to the evidence should have been sustained because there was no proof that the bus was not stopped at its regular stopping place at Lexington and Osage as plaintiff alighted; and because there was no evidence that plaintiff had stepped into a depression or hole four to six inches deep and ten to twelve inches square, as described in her petition.

With reference to the first contention, all the evidence is to the effect that there was a regular bus stop on the south side of Lexington Avenue and west of Osage; but the exact limits, to the very inch, of the stopping place are not described by any witness. Mr. Zimmerman, in describing the depressed area, testified, "It was right where the buses would always stop the back wheels. . . . In most cases when the bus would stop it would be partly extended out in the driveway. Just long enough to stop or unload. . . . It was the buses always stopping right there and the back wheel would most generally stop in that depression as they put on the brakes and start up it would keep rolling it out a little more." Mr. Mack testified there was a bus stop right in front of the filling station and that the bus would stop with the rear wheels in the depression. Plaintiff's testimony was to the effect that on the occasion of her injuries the bus stopped with the middle or rear door immediately at and over the depression, so it can be inferred the bus did not stop, as usual, with the rear wheels in the depression. We are of the opinion that there was substantial evidence that the bus did not stop in exactly its usual and customary place or position.

However, we are of the opinion that the allegation that the bus was stopped away from the regular stopping place was not an essential element of plaintiff's cause of action and should be treated as surplusage. This for the reason that the legal liability of a carrier under such circumstances is not dependent on whether the passenger is discharged at the regular stopping place or not. The operator did stop the bus at approximately the regular stopping place for the purpose of discharging passengers and it was his duty to use the proper degree

of care to select a reasonably safe place for them to alight. [Murphy v. Metropolitan Street Rwy. Co., 125 Mo. App. 269; Caley v. Kansas City et al., 226 Mo. App. 934, 48 S. W. (2d) 26, 27.]

The petition is broad enough to charge negligence in failing to stop the bus at a reasonably safe place for plaintiff to alight. Among other things it charges: ''That the defendant's bus driver negligently stopped his said bus with the door, through which persons, including the plaintiff, had to alight, in close proximity and directly against and over said defect and *negligently failed to furnish the plaintiff with a safe place upon which to alight* and negligently failed to stop his bus at the regular stopping place.'' (Italics ours.) The allegation of negligence in failing to stop the bus at the regular stopping place being a non-essential allegation, may be treated as surplusage and the doctrine of estoppel by pleading is inapplicable. [Brown v. Alton R. Co., 236 Mo. App. 26, 151 S. W. (2d) 727, 737; Senf v. St. Louis & Suburban Rwy. Co., 112 Mo. App. 74; Took v. Wells, 331 Mo. 249, 53 S. W. (2d) 389, 391-2; Mitchell v. Wabash R. Co., 334 Mo. 926, 69 S. W. (2d) 286, 290.] We have considered the cases cited by defendant bus company and are of the opinion they are not controlling under the pleadings and evidence in this case. Those cases are: [State ex rel. Boatmen's Nat'l. Bank v. Webster Grove General Sewer Dist., 327 Mo. 594, 37 S. W. (2d) 905; Creighton v. Mo. Pac. R. Co., 229 Mo. App. 325, 66 S. W. (2d) 980, and Morrison v. Painter et al., 170 S. W. (2d) 965.]

However, the bus company argues that even if it be conceded that the allegation concerning the usual stopping place of the bus is surplusage, ''it was still incumbent upon plaintiff to prove the material fact that the bus stopped with the step of the rear door at or over this deep depression or hole, which she claimed as the specific and proximate cause of her fall in her petition.'' It argues there is no evidence plaintiff stepped into the depression or hole described as a place ten to twelve inches square and four to six inches deep. That under her testimony it is shown that it was physically impossible for her to have stepped into such hole ''since it would have been under the bus by her own testimony.'' The evidence does show that there was a depressed and very rough place in the street, and the bus operator knew that and considered it dangerous for people to get off there, and that it had been there for a year or more before the accident, and in stopping his bus he tried to avoid it as much as he could; that after plaintiff fell he went to her and she was sitting in this rough place. There is also evidence that within the larger rough area there was a *smaller hole* which is described by one witness, who measured it, as being ten to twelve inches square and four to six inches deep; others estimated its depth at three inches. This is the hole which it is alleged plaintiff stepped into and which defendant, bus company, contends there is no evidence that she stepped into that particular hole, but, on

the contrary, the evidence shows it was under the bus and it would have been a physical impossibility for her to have stepped into it. This contention is based on plaintiff's testimony to the effect that when the bus pulled up there for the stop, it stopped right alongside the curb, not at an angle, but right alongside and close to the curb; that as she stepped from the bus, her left foot was in a "little hole there;" the hole was "at the curb, where the curbing should have been;" that the only evidence locating the south edge of the larger depression placed it five to six inches into the street from where the curb would have been, and that the width of the larger deprssion from from one and one-half to two feet, and that the "little hole" was at the north edge of the larger depression, and therefore it must have been approximately two feet north of the curb line. From this line of evidence the bus company contends that plaintiff could not have stepped in the "little hole" because it would have been under the bus. We cannot agree that the evidence must be so narrowly considered. In describing where the bus stopped, plaintiff's testimony is: "Q. Did it stop close to where the curbing would be if it was extended there? A. Yes, sir, it stopped close to that. . . . Q. When this bus pulled up there at the stop, did it stop up there level with the curbing? I mean alongside the curbing? A. Right alongside the curbing, yes. Q. What I mean, it didn't stop at an angle, did it? A. No, sir. . . . Q. How close was the step of the bus to this hole as it was there when you were getting off of it? A. Well, in my estimation it was about six inches. Q. So that it would be directly underneath the step, is that right? A. Yes, sir." From this evidence it would seem clear we would not be justified in holding, as a matter of law, that the "little hole", described in the petition and evidence, was under the bus, and therefore it would be physically impossible for plaintiff to have stepped into the "little hole." Plaintiff's testimony that the bus stopped close to the curb and right alongside the curb, and not at an angle, are relative terms or expressions and cannot be held to mean only that the bus was immediately against or in contact with the curb line.

Defendant bus company also contends that its demurrer to the evidence should have been sustained because of a conflict in plaintiff's testimony at the trial and statements she had given in a deposition taken some two years prior. The substance of the complaint is that when her deposition was taken plaintiff testified to the effect that she did not look to see what made her fall and did not look to see and observe the condition of the pavement when she stepped from the bus; while at the trial she testified that she did look in the usual way while alighting from the bus and did observe the condition of the pavement immediately after the accident. The bus company contends we must apply the rule announced in Steele v. K. C. Southern R. Co., 302 Mo. 207, 257 S. W. 756, and Siegel v. M.-K.-T. R. Co., 342 Mo.

1130, 119 S. W. (2d) 376. We are understood the rule in those two cases, if a party, at a trial, testified to a certain set of facts, and later, during the same trial testifies to the contrary, without giving a reasonable explanaion for the conflict, he cancels his testimony and leaves it without any probative value. However, that is not the situation here. The conflict arises between testimony given in a deposition and that given at the trial of the case. In the Steele case the court en banc, in discussing a prior decision by the court en banc, Davidson v. St. L. and S. F. Ry. Co., 301 Mo. 79, announced the Missouri rule to be (219):

"It is thus apparent that Court en Banc is committed to the proposition that upon a subsequent trial the plaintiff is not absolutely bound by his testimony at a former trial; that the jury has the right to consider his testimony given at the subsequent trial, notwithstanding it is shown that his testimony at the former trial tended to show the existence of a contrary state of facts; that the rule announced in the first Steele Case opinion cannot be extended to a subsequent trial. It is, therefore, necessary for us to hold that the trial court erred in giving to the jury its peremptory instruction to find the issues in favor of defendant."

In Short v. White, 234 Mo. App. 499, 133 S. W. (2d) 1039, this court, after reviewing many Missouri authorities, passed on this specific question and said, l. c. 1042:

"If a party be not bound at a subsequent trial by a solemn declaration made by him at a preceding trial, certainly he will not be absolutely bound by testimony given in a deposition taken prior to the trial of a case. The introduction of conflicting statements of a party made at some prior hearing goes only to challenge the credibility of such party's testimony given at the trial of the case."

In the recent case of McNatt v. Wabash R. Co., 341 Mo. 516, 108 S. W. (2d) 33, 39, the Supreme Court reaffirms the above quoted rule announced in the Steele case. It follows that the contradiction in plaintiff's testimony given in the deposition and that given at the trial does not destroy the probative value of the trial evidence but is a matter of impeachment. The jury must decide which testimony is true. We should add that plaintiff sought to explain the conflict in the testimony by saying that she was confused and did not understand the questions asked, and that the attorney taking the deposition "hollered" at her. We do not deem it necessary to lengthen this opinion in order to discuss the reasonableness of her explanation.

Defendant city contends that its demurrer should have been sustained because there was no substantial evidence to prove that the city had actual or constructive knowledge of the existence of what is referred to as the "little hole", which was within the limits of the larger depressed surface. As we understand the city's argument, it concedes, or at least does not deny, that the evidence is amply suf-

ficient to charge it with knowledge of the defective and dangerous condition of the "larger depression", but that no witness testified how long the "little hole" (ten to twelve inches square and four to six inches deep) had been in the street; and since that is the particular hole, which caused plaintiff's injuries, she must prove actual or constructive notice of its existence by the city.

Without restating the evidence set out above, it will be observed that plaintiff and witnesses Mack, Kirkham, Zimmerman and Schultz all mention *a hole* in the deepest part of the depression, and the length of time that condition had existed. We think such evidence sufficient to raise the issue of the city's knowledge of the existence of the "little hole." However, we do not believe it was necessary for plaintiff's evidence to prove specifically the city had actual or constructive knowledge of the existence of the "little hole" within the "big hole or depression." Its knowledge of the larger and dangerous depression carried with it notice of the various component parts making up the larger dangerous area. [Huff v. City of Marshall 97 Mo. App. 542; Miller v. Town of Canton, 112 Mo. App. 322; Thompson v. City of Poplar Bluff, 124 Mo. App. 439 Merritt v. Kansas City, 46 S. W. (2d) 275, 277; Fadem v. City of St. Louis et al., 99 S. W. (2d) 511, 515.]

Defendant bus company next contends the court erred in giving plaintiff's instruction No. 3 because there was no evidence to support the submission of plaintiff's stepping into the hole described as "4 to 6 inches deep and 10 to 12 inches square." What we have already said disposes of this contention. The evidence was sufficient to authorize the submission of that issue to the jury. [Stewart v. George B. Peck Company, 234 Mo. App. 864, 135 S. W. (2d) 405, 411.]

Both defendants charge that the court erred in admitting certain testimony of witnesses Mack and Kirkham to the effect that they had seen other passengers stumble or fall at this particular place prior to the time plaintiff fell. These two witnesses, and others, had described the condition of the street at the place of the accident, and that such condition had existed several months prior to the occurrence in issue. Mr. Mack said it had been getting worse since along in the summer; Kirkham said the condition had existed since he went to work at the filling station in the spring prior to the accident. Both witnesses said they had seen passengers stumble at this defective place while alighting from the rear door of a bus which had stopped at that point.

Defendants argue that it is not shown that the defective condition was the same when plaintiff fell as it was when other persons stumbled or fell, or that the bus had stopped at exactly the same place on such occasions. When all the evidence is given consideration, we are forced to the conclusion that the testimony does establish the fact that the condition was substantially as bad when other persons

stumbled or fell as it was when plaintiff was injured, and that the defective condition was at the same place; also that the busses had stopped at substantially the same place, that is, immediately adjacent to the defective place in the street. At the time the evidence of other persons stumbling or falling was introduced, both defendants were contending that the place in' the street was not dangerous; and the city was denying it had any knowledge of such place.

In Taylor v. Kansas City, 112 S. W. (2d) 562, the Supreme Court announced the Missouri rule concerning the introduction of evidence of independent events and occurrences in this language (566):

"This appears to be a case coming within the exception to the general rule 'which ordinarily excludes evidence of independent events and occurrences . . . not directly connected with the matter in dispute' (Lake Superior Loader Co. v. Huttig Lead & Zinc Co., 305 Mo. 130, 264 S. W. 396, 399) so that it is competent in this kind of a case to show prior accidents occurring 'under the same conditions at a given spot from the same cause' (Charlton v. St. Louis & San Francisco R. Co., 200 Mo. 413, 98 S. W. 529, 538) as '*circumstances with other evidence*' tending to show the dangerous or unsafe condition of the sidewalk on account of the alleged abrupt slope or slant therein, which plaintiff claims caused her to fall, and also as tending to show notice or knowledge on the part of the city of the existence of the dangerous or unsafe condition in the sidewalk at that place."
This rule was reaffirmed and followed by the Supreme Court in Cameron v. Small, 182 S. W. (2d) 565, 570. [See, also Bornhoft y. City of Jefferson, 118 S. W. (2d) 93; Asbury v. Fidelity National Bank & Trust Co., 231 Mo. App. 437, 100 S. W. (2d) 946, 949.]

However, in this case, after the bus operator testified to the effect that this condition had existed in the street at this particular place for a year or more and that he knew it was dangerous and undertook to stop his bus in such a position that passengers would not be required to pass over the unsafe place, the plaintiff requested, and the court gave, an instruction withdrawing from the jury's consideration all evidence of stumbling or falling by persons other than the plaintiff. But defendants argue that such withdrawal was ineffective because the testimony was so *impressive* that the error, if any, could not be removed by such a withdrawal instruction. We are not impressed with the force of this argument when all the evidence is considered.

In Hanson v. City Light & Traction Co., 178 S. W. (2d) 804, this court, after reviewing the authorities, said (812):

"An instruction of the court to the jury to disregard evidence erroneously admitted is ordinarily sufficient. The favorite quotation on the subject is lifted from Harrison v. Kansas City Electric Light Co., 195 Mo. 606, 635, 93 S. W. 951, 960, where it is said: 'To hold otherwise would be to establish the rule of practice that when a court made a mistake and admitted incompetent testimony, it could not ef-

fectually correct the error by instruction to the jury, but that in order to remove the sting of the error it would have to discharge the jury and award a new trial before a new venire. Such a rule could not reasonably be expected to be announced by any court. When a trial court becomes satisfied that it has erred in the admission of testimony, all that it can do is to instruct the jury to disregard it, and the presumption is that the jury did disregard it.' The above statement was adopted in Evans v. Missouri Pacific Railroad Co., 342 Mo. 420, 426, 116 S. W. (2d) 8, and in Grott v. Johnson, Stephens & Shinkle Shoe Co. (Mo.), 2 S. W. (2d) 785, 788.

"Of course, there are exceptions to the general rule such as shown in National Cash Register Co. v. Kay (Mo. App.), 119 S. W. (2d) 437; Chenoweth v. Sutherland, 141 Mo. App. 272, 124 S. W. 1055; Meyer v. Lewis, 43 Mo. App. 417; and Mueller v. Weitz, 56 Mo. App. 36, cited by appellant. The general rule and the exceptions are set forth in 5 C. J. S., Appeal and Error, beginning on page 1031 with par. 1737 b. The statement is made that the general rule applies 'especially where there is no motion for a mistrial.' Defendant merely offered its various objections to the evidence, but evidently did not regard its admission sufficiently injurious to move for a mistrial at that time, and no such motion was made. Under the circumstances shown by the record the trial judge was in the best position to determine the injurious effect of the testimony and whether it was beyond the reach of the instruction given."

This point is ruled against the defendants.

Defendant city charges error in plaintiff's instruction No. 2, which defines its liability. This instruction told the jury that if it found from all the evidence ". . . that the pavement at said point was rough, wavy, lumpy and uneven, with a hole or depression therein, and . . . that said condition covered an area approximately 4 to 6 inches deep and 10 to 12 inches square, and . . . that by reason of said condition that said street and pavement was not reasonably safe for the public traveling thereover, . . . and if you find that said rough, wavy, lumpy and raised place, together with said hole or depression, . . . in said street . . . had existed for such a length of time prior to October 1st, 1941, that the City of Independence knew, or by the exercise of ordinary care could have known thereof in reasonable time before October 1st, 1941, to have repaired said place before said date, but negligently failed to do so, . . . and, . . . plaintiff, . . . while getting off of the bus referred to in the evidence at said time and place, . . . she stepped into and against said lumpy, uneven and depressed place and hole on said pavement, . . . and that as a direct result thereof, etc. . . ."

The city first contends that this instruction is "confusing and befuddling." To this we cannot agree. The instruction follows the

description of the dangerous place in about the language used in the petition and as described by the witnesses. It is also contended that the instruction was not sufficiently definite and certain in describing the *little hole* as being the dangerous place where plaintiff was injured, but was broad enough to authorize recovery if she was injured anywhere within the *larger depression*. We do not think the instruction is defective for this reason; but even if it could be said the description is not as specific as it might have been, we find that the city, by its instruction 1C, describes the place in very general language as follows: ". . . the defective condition of the street at the point where she stepped from the bus, . . ." Under such circumstances, the city is not in a position to complain of that particular part of plaintiff's instruction 2. The situation is not one involving the rule that failure to predicate, in a plaintiff's main instruction, a fact or facts essential to recovery cannot be cured by an instruction given on behalf of the defendant. [Goslin v. Kurn, 351 Mo. 395, 173 S. W. (2d) 79, 84; Crews v. Kansas City Public Service Company, 341 Mo. 1090, 111 S. W. (2d) 54, 58; Johnson v. Hurch Delivery Service Inc., 351 Mo. 73, 171 S. W. (2d) 656, 657.]

The next complaint is that the instruction does not require the jury to find the city had *reasonable time* to repair the street after actual or constructive knowledge of the defect, thereby enlarging its duty in respect to the care required in maintaining the streets. By reference to the above quoted part of the instruction it will be observed that the jury was required to find ". . . that said rough, wavy, lumpy and raised place together with said hole or depression, . . . in said street . . . had existed such a length of time prior to October 1, 1941, that the city of Independence knew or by the exercise of ordinary care could have known thereof *in reasonable time before October 1, 1941, to have repaired said place before said date, but negligently failed to do so, if you so find,* etc. . . ." (Italics ours.)

Defendant relies upon the cases of Allen v. Kansas City, 64 S. W. (2d) 765, 766, and Ballard v. Kansas City, 126 Mo. App. 541. These cases and many others announce the rule that a city is entitled to reasonable time after it obtains knowledge, actual or constructive, of a dangerous condition of the street in which to repair the condition and that it is not liable until it has neglected such opportunity, and that a plaintiff's instruction, in such a case, must require the jury so to find. We are of the opinion that the present instruction meets that requirement. It requires the jury to find that a certain dangerous condition existed in the street and that it had existed for such a length of time prior to the date of the accident that the city knew or could have known of that condition *in reasonable time before October 1, 1941,* (the date of the accident), *to have repaired said place, but negligently failed to do so.* We think the words "in reasonable time" refer to the time for making repairs and not to the acquisition

of knowledge of the defect. The instruction could be more clearly written but we do not consider it so awkwardly drawn as to require a reversal. A somewhat similar instruction was approved by this court in Merritt v. Kansas City, 46 S. W. (2d) 275, 281. [See, also, Simmons v. Kansas City Jockey Club, 334 Mo. 99, 66 S. W. (2d) 119, 123.] The instructions condemned by this court in the Allen and Ballard cases, *supra,* did not require the jury to find that the defendant had *reasonable time* in which to make the repairs after knowledge of the defect, and "negligently failed to do so." The last quotation was not in either of those instructions. For such reasons they are to be distinguished from the present case. There is no reversible error in plaintiff's instruction 2.

Both defendants complain that the verdict is grossly excessive.

Plaintiff was a woman sixty-seven years of age and working as a house maid for $6 per week. Her injuries consisted of a fracture of the base of the fifth metatarsal bone, the prominent bone on the outside of the left foot and "a suggestion of an impacted fracture of the first cuneiform bone" in the same foot.

Dr. Griffin, who was called after the accident and treated plaintiff for her injuries, testified, "I found her left foot badly swollen; . . . I used a two-inch bandage on it at that time; . . . next I put on a plaster cast . . . From the foot right up just below the knee." She wore that cast about three weeks and then her foot was put in a plaster of Paris cast, which she wore for about five weeks. When the last cast was removed the swelling was reduced considerably and her foot was in "fair shape"; but she could not walk; she used crutches for a time and then walked with a cane. He treated her for about four months. Two or three days before the trial, which was more than two years after the accident, Dr. Griffin examined plaintiff and found her foot was tender on pressure over the area of the injury and gave as his opinion that she might feel the effects of it for sometime; ". . . the older she gets the more she will feel it." He thought her condition would improve over what it was at the time of the trial. Dr. Donaldson took x-rays of plaintiff's foot three weeks after the accident and "found a fracture of the fifth metatarsal bone. That is the prominent bone on the outside of the foot." That such an injury would "very likely" damage the nerves and ligaments in that area. Dr. Campbell, an orthopedic surgeon, examined plaintiff just a few days before the trial and found that she "had an old fracture at the base of the fifth metatarsal bone with flat foot. . . . I note in this plate there is a suggestion of an impacted fracture of the first cuneiform bone. That is on the inner border of the foot. . . . I found that this patient has some tenderness over the base of the fifth metatarsal bone of her left foot and that this tenderness extended downward toward the toe approximately about one-half the distance and there was also a clicking sound on manipulation of the left foot.

. . . I would consider that she has a loss of fifty per cent permanent partial disability of that foot. . . . I think her condition will remain essentially as it is at present. . . . I think she probably would have pain if she were on her feet all day. . . . I don't feel that she would benefit by any further treatment.''

Plaintiff testified that she suffered ''very much pain night and day,'' and that the doctor gave her medicine for the pain; he said it was aspirin and morphine tablets. She was off work about six months and when she went back to her former employers she used a cane and a crutch to get about the house. She continued to work until June, 1943, but ''I was getting worse. . . . I left because I wanted to go and rest and get off my feet. I wasn't doing any good.'' Her foot would swell and pain and ache. She had to quit work because of her condition; ''my foot and ankle gives me a good deal of trouble off and on all the time. . . . I used a cane up until now.'' She said she could not step down on that foot without suffering pain; in walking she doesn't put her foot down straight but rather to the side; she does this because of ''the misery it causes me when I put my weight on it.''

There is no hard and fast rule by which the question of damages is to be exactly gauged and determined in each case. Appellate courts are not inclined to interfere with the verdict of juries on the ground of excessiveness unless it clearly appears that the verdict is unreasonable, or, as the courts sometimes say, unconscionable or one calculated to shock the judicial conscience or conclusively shows prejudice and passion on the part of the jury. The matter of the estimation of damages in cases of this character is so entirely within the discretion of the jury, in the first instance, and then by the trial court, that the appellate courts cautiously approach the question of ordering a reduction of the verdict and judgment which has been fixed by the jury and the trial court.

It is true, in this case, plaintiff suffered an injury to but one foot, but the evidence justifies the conclusion that that injury will cause a substantial permanent damage; in the opinion of Dr. Campbell a 50 per cent permanent partial disability. A person's feet are a very important and essential part of the body, and particularly so to one who must earn a livelihood by manual labor. While it may be conceded that the judgment is a rather large one for the injuries, yet this would not be a sufficient showing to authorize us to interfere.

Considering all the evidence, together with the fact of which we must take notice that the purchasing value of the dollar was considerably reduced at the time of the judgment, we are not convinced that the judgment is so excessive as to require a *remittitur*. [Hurst v. Chi. B. & Q. R. Co., 219 S. W. (Mo.) 566, 568.]

Finding no reversible error, the judgment should be affirmed. It is so ordered. All concur.